**HOLMQUIST v. BLAIR, Commissioner of Internal Revenue (two cases).**

Circuit Court of Appeals, Eighth Circuit.
September 14, 1929.

Nos. 8536, 8537.

David J. Shorb, of Washington, D. C. (Earle W. Wallick and Ben Jenkins, both of Washington, D. C., on the brief), for appellants.

V. J. Heffernan, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Mabel Walker Willebrandt, Asst. Atty. Gen., Sewall Key and John Vaughan Groner, Sp. Asst. Attys. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Shelby S. Faulkner, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for appellee.

Before STONE, Circuit Judge, and MUNGER and REEVES, District Judges.

STONE, Circuit Judge. A. C. Holmquist and J. W. Holmquist were stockholders of the Holmquist Grain & Lumber Company. June 29, 1917, and June 15, 1919, the corporation sold certain capital assets. December 31, 1922, the corporation made a partial liquidation through a dividend. As the result of an investigation, the Commissioner determined tax deficiencies for 1922 against the above two individual taxpayers on account of this dividend. This action of the Commissioner was sustained by the Board of Tax Appeals. Each brings his separate petition for review. The cases involve the same matters and are presented together.

The following findings of fact by the Board are not disputed.

"From 1902 to 1922, inclusive, each of the petitioners was a stockholder of the Holmquist Grain & Lumber Company and, together, at all times, owned a majority of the outstanding capital stock of that company, which was organized in May, 1902, then taking over the assets and liabilities of the Holmquist Grain & Lumber Company, a corporation the charter of which had expired, and the business of the Holmquist Company, a partnership. The corporation then took over tangible assets valued at $349,785.79, against which it assumed liabilities in the amount of $114,144.31. It issued capital stock of $125,000 par value and entered the balance of the tangible assets acquired as paid-in surplus in the amount of $110,641.48.

"In 1908 the corporation issued and distributed to its then stockholders a stock dividend of $125,000.

"June 29, 1917, the corporation purchased 789½ shares of its outstanding stock then in the hands of a group of minority stockholders, at an agreed price of $410 a share, amounting to $323,695, which stock was paid by conveying and turning over to the sellers certain assets of the corporation at an agreed value of $51,075.13, and the payment to said sellers of cash in the amount of $272,619.87. In completing this transaction the corporation turned over and conveyed to the sellers grain elevators and yard properties located at several towns in the State of Nebraska at the agreed price of $51,075.13, which amount was then the cost of said properties acquired prior to March 1, 1913, as shown on the books of said corporation. A part of these properties had been acquired in 1902 at a cost of $35,086.18; the balance thereof had been acquired in 1908 at a cost of $15,988.95. Immediately after the purchase of the 789½ shares of minority stock the corporation caused the same number of shares to be reissued and to be distributed to its then remaining stockholders.

"June 15, 1919, the corporation sold certain other of its capital assets which had been acquired in June, 1912, at the agreed selling price of $6,503.19, which amount was the cost of the properties as shown on the books of the corporation.

"December 31, 1922, the corporation made a partial liquidation distribution of its assets in the form of a cash liquidating dividend in the amount of $394,568.68. Of this amount A. C. Holmquist received $151,514.37, J. W. Holmquist received $242,107.35, and H. M. Holmquist, not a party to these actions, received $946.96.

"The corporation had consistently kept its books and from and after the year 1909 made corporation excise and income tax returns on the basis of fiscal years ending March 31, of each calendar year. Prior to its fiscal year beginning April 1, 1912, the corporation had not shown on its books any account of depreciation, upon its depreciable assets. For its fiscal years ending March 31, 1913, and March 31, 1916, inclusive, it entered in its books depreciation reserves computed at the rate of 10 per cent upon the book cost of its depreciable assets, and it claimed the same amount as deductions in its income-tax returns for its said years. For its fiscal years ending March 31, 1917, to March 31, 1919, inclusive, the corporation entered in its books additions to depreciation reserve computed at the rate of 5 per cent upon the cost of its depreciable assets and claimed the same amounts in its income and profits-tax

returns for those years. For the fiscal years ending March 31, 1920 to 1922, inclusive, the Commissioner adjusted the corporation's deduction for depreciation on the basis of 4 per cent upon the cost of its depreciable assets and allowed such amount as deductions from gross income for those years.

"In connection with the sales of capital assets occurring in 1917 and 1919 the corporation's books show, and its income and profits-tax returns reported, no gains realized or loss sustained as a result of such disposition. No modification or change of the corporation's income and profits-tax returns for its fiscal years ending March 31, 1913, to March 31, 1919, have been made or attempted to be made on account of the varying rates of depreciation set up on the books and claimed as deductions from gross income during those years.

"Following the distribution of the partial liquidating dividend made December 31, 1922, the Commissioner made a further investigation of the books of account of the corporation for the purpose, among other things, of determining the portion of the liquidating dividend which was made up of earnings and profits accumulated after February 28, 1913, and for this purpose the Commissioner applied to the depreciable assets a rate of depreciation of 4 per cent upon the cost of such assets from the time the corporation was organized until December 31, 1922. He further included in gains and profits realized in 1917 an amount equal to the difference between the cost of the assets then disposed of less the amount of depreciation at 4 per cent applied on cost and the sale price. Similarly for the year 1919 he included as gains and profits realized in that year an amount equal to the difference between the cost of such assets less the amount of depreciation computed at the rate of 4 per cent upon the same and the selling price. He further made adjustments of surplus resulting from the then computation of depreciation reserves, the gains from the sale of capital assets, and the decrease of surplus resulting from the purchase of the minority stock, both with respect to surplus and undivided profits accrued prior to March 1, 1913, and surplus and undivided profits accrued subsequent to February 28, 1913.

"The corporation has not, and these petitioners do not now, dispute the reasonableness of the depreciation rate of 4 per cent as applied to the depreciable assets of the corporation throughout the period of its existence to and including December 31, 1922. The Commissioner reduced surplus account

as of June 29, 1917, in the total amount of $323,695, paid for the minority stock purchase as of that date.

"As a result of his investigation the Commissioner determined that the earned surplus of the corporation on December 31, 1922, was $499,074, and that of this total the amount of $178,233.75 represented earnings and profit accumulated subsequent to February 28, 1913."

The above profits earned since February 28, 1913 ($178,233.75), were, with a small amount to a third stockholder, allocated to appellants.

No question of fraud is present. Appellants present two matters here. The first is stated as follows:

"The action of the Commissioner in adjusting the depreciation reserves of the Holmquist Grain & Lumber Company in a computation of the tax liability of an individual stockholder of such corporation, was not proper."

No attack is made by either appellant upon the determination that 4 per cent. would have been a fair rate of depreciation from the acquisition of the property up to the tax year (1922) here involved. The contention is that the corporation had made depreciation reductions of 10 per cent. for each of its fiscal years 1913–1916, inclusive, and of 5 per cent. for 1917–1919, inclusive, which had been accepted by three separate tax examiners, and the resulting depreciation reserve had never been readjusted as to the corporation; that the Commissioner cannot, as to the corporation or as to these taxpayers (stockholders) reopen that matter. The position of the Commissioner is, first, that the stockholder is a different taxpayer from the corporation, therefore determination as to the corporation does not foreclose re-examination and a different determination as to the stockholder; second, that, even as to the same taxpayer, there may be repeated re-examinations and determinations within the period of statutory limitation.

It is not and could not be claimed that any constitutional right of appellants has been infringed by the above action of the Commissioner. Congress has the right to levy such kind of tax. As a necessary corollary to that right, it may prescribe the manner of ascertaining the amount thereof. When the character of the tax and the circumstances surrounding the levy thereof are considered, it is entirely reasonable to provide for reascertainments of the amounts due—which, of course, must include determination of the elements entering into such

ascertainment. Therefore the issue here is to determine what Congress has required in this respect.

This tax was levied under the Revenue Act of 1921 (42 Stat. 227). Under that act, the Commissioner must determine and assess the tax within four years after the return is filed. Section 250(d). Also, refunds to the taxpayer are allowed within five years from the time the return was due. Section 252. The Commissioner may test the return by examinations. Section 1308. Section 1309 provides against "unnecessary examinations or investigations," and that there shall be but one examination for each taxable year "unless the taxpayer requests otherwise or unless the Commissioner, after investigation, notifies the taxpayer in writing that an additional inspection is necessary." Section 1312 provides that, where the Commissioner has determined and assessed the tax and without protest it has been fully paid or a refund accepted and a written agreement entered into by the Commissioner and the taxpayer (approved by the Secretary) "such determination and assessment shall be final and conclusive" except for fraud, malfeasance, or misstatement of material fact. Sections 1309 and 1312 leave no doubt of the authorized power in the Commissioner to make re-examinations, redeterminations, and reassessments. From the above sections of the act it is clear that Congress authorized re-examinations by the Commissioner, and that the only limits thereon are that such must be made within four years (section 250(d) and must be after written notice to the taxpayer after investigation of the necessity for such re-examinations. Section 1312 points out the way and the only way in which an assessment may be made final before expiration of the four-year period. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." Botany Mills v. United States, 278 U. S. 282, 289, 49 S. Ct. 129, 131, 73 L. Ed. 379.

Appellants cite Woodworth v. Kales, 26 F.(2d) 178 (C. C. A. 6), as being contrary. A careful reading of that case leaves doubt as to whether, considering the facts and the law (Revenue Act of 1918 [40 Stat. 1057]) there involved, the decision goes quite as far as is here contended. However that may be, we prefer the reasoning of Loewy & Son, Inc., v. Commissioner, 31 F.(2d) 652, 654, (C. C. A. 2), wherein the court says: "It is hard to see why section 1312 should require a written agreement, approved by the Secretary of the Treasury, in order to prevent the modification of an assessment, if the assessment under such conditions could not be revised any way." The Loewy Case involved a second determination after the taxpayer had, without protest, paid additional tax levied on a prior reassessment. There is no element of estoppel in the present case, even if estoppel can be urged against the government in connection with taxation (a matter we do not examine). Therefore our conclusion is that the Commissioner may, unless precluded by a written agreement under section 1312, repeatedly redetermine and reassess under the act of 1921 and for a tax under that act within four years after the return is filed, provided such is upon written notice after investigation of the necessity for such action. Section 1309.

The second issue here is whether there can be such an examination when the matter before the Commissioner is determination of the tax against a stockholder. At the time this determination was made, the statutory limit under either the act of 1918 or that of 1921 had run during which there might have been a redetermination of these items (1913–1919) had the matter before the Commissioner been taxes due directly from the corporation. The argument of the appellants is that the tax upon a liquidating dividend cannot be determined by changing the elements which have become final as to the corporation. In particular, that the same measure of depreciation reserve must be used. Appellants do not question that 4 per cent. annually would have been a proper allowance for depreciation reserve, but they say that 10 per cent. (1913–1916) and 5 per cent. (1917–1919) were used and have become final as to the corporation, and therefore the Commissioner must accept such when dealing with a liquidating dividend. Ordinary practice probably is that the same depreciation reserve would be applied to each situation. However, the question here is one of power. The matter for determination is the tax due from the stockholder because of the dividend in partial liquidation. An important element in such determination is the depreciation reserve. The taxpayer can justly ask only that such depreciation be placed at a fair figure. No injustice is done him if that be done. If such depreciation has been placed too high in assessment of taxes against the corporation, such has resulted in improper loss to the government and improper gain to the corporation and indirectly to the stockholders. The circumstance that

**14**

such error is beyond correction as to the corporation is no reason why it should be perpetuated and result in further improper loss to the government and further improper gain to the stockholders. We think the Commissioner had the authority to ascertain the true depreciation in connection with and for the purpose of determining the assessment against the stockholder on account of a dividend in partial liquidation.

▮ The above discussion has been of issues going to the entire assessment. Appellants present a narrower issue as to two items. These items are the profits found by the Commissioner to have resulted from the sale of two grain elevators in 1917 and 1919, respectively. These elevators sold in 1917 and 1919, respectively, at the prices which they had cost when purchased prior to March 1, 1913. The Commissioner found there had been depreciation at 4 per cent. from acquisition and that the entire profit had been earned since March 1, 1913. There was no evidence introduced before the Board of Tax Appeals as to what profit, if any, was realized prior to March 1, 1913. Appellants argue that, accepting the Commissioner's value as of March 1, 1913 (cost less 4 per cent. annual depreciation to that date), it should be assumed, without proof, that the earnings were at the same rate (4 per cent. annually) as the depreciation and during the same years. There is no logical basis for such assumption. With the March 1, 1913, value fixed and the sale price known, the profit results. Whether that profit accrued prior or subsequent to March 1, 1913 (that is, whether the "fair market price or value" on that date was greater than cost less depreciation), was a matter of evidentiary proof not of bare assumption. As the burden was upon appellants to show error in the determination of the Commissioner, that determination would stand unless overthrown by proof. No such proof was offered.

The petitions to review should be and they are dismissed.