Jane G. Thompson CURRY, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C/A AC–373.

United States District Court
E. D. South Carolina,
Columbia Division.

Dec. 14, 1960.

900

Robinson, McFadden & Moore, David W. Robinson, II, Columbia, S. C., for plaintiff.

N. Welch Morrisette, Jr., Columbia, S. C., for defendant.

TIMMERMAN, Chief Judge.

This action was brought by Jane G. Thompson Curry for the purpose of recovering individual income taxes allegedly wrongfully assessed and collected by the Commissioner of Internal Revenue for the calendar year 1955. The amount involved is $4,679.81, plus interest from August 25, 1958. Neither party requested a jury trial and all facts were stipulated by mutual agreement. Briefs were submitted with oral arguments waived.

The facts are somewhat unique and a rather full statement is required. Prior to 1910 G. A. Guignard, a Lexington County resident owning extensive properties, and others acquired lands adjoining the Saluda River in Lexington County on what is now the site of the Lake Murray Reservoir. Thereafter, beginning in 1910, Guignard entered into a series of negotiations and contracts with several companies for the sale of these properties for use as a reservoir in exchange for certain considerations to be furnished Guignard. The conditions of the early agreements were not met and controver-

sies between the parties developed. In 1913 a settlement agreement was reached between Guignard and the South Carolina Power Company (now South Carolina Electric & Gas Company), successor to the parties who earlier negotiated with Guignard, and on February 1, 1913, the contract in question was executed. Pursuant to that contract, lands comprising a large part of what is now Lake Murray were conveyed to the South Carolina Power Company. In exchange Guignard received $35,000 in cash, a release of his prior obligations, and, in addition, the power company agreed that it would

"* * * furnish in perpetuity free of all cost (except as hereinafter specified) unto said G. A. Guignard, his heirs and assigns, electrical energy of 300 primary HP at a reasonable secondary voltage from its plant whenever the same is erected on Saluda River at Dreher Shoals, upon the premises hereinafter described. * * *"

This provision is the subject of the controversy between the parties.

Guignard died testate on July 18, 1926, leaving most of his estate, including the power agreement, to some eleven relatives in undivided interests. It appears that the power contract was valued at $25,000 in Guignard's probate estate and at $60,000 for his Federal estate tax purposes. In 1929 the beneficiaries incorporated the Lexington Holding Company, a South Carolina corporation, and on March 29, 1929, the Lexington Holding Company contracted with the executors of the estate of G. A. Guignard to purchase the residuary assets of the estate. The consideration to be paid, in cash, for each of these assets was listed in the contract and the company paid $75,000 for the power agreement.

After acquiring the power contract, Lexington Holding Company received the 300 HP each year and, in turn, sold the power to other users. From 1929 to October 31, 1955, the company received a total of $245,090.95 from these sales, the yearly receipts varying from a low of $1,478.02 in 1935 to a high of $18,-

373.90 in 1950. On October 31, 1955 the company was liquidated pursuant to Section 333 of the Internal Revenue Code 26 U.S.C.A. § 333, with each shareholder (among which was the plaintiff) receiving his or her pro-rata share of the corporate assets. This liquidation is the occasion for this litigation.

Under Section 333, no taxable gain is realized by the stockholder upon the receipt of the liquidating corporation's assets except to the extent of the company's existing "earnings and profits." To that extent:

"* * * there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913 * * *." Section 333(e) (1).

The general question before this Court is the amount of "earnings and profits" of the Lexington Holding Company at the date of its liquidation. The Commissioner of Internal Revenue determined the "earnings and profits" to be $178,-159.68. The plaintiff, a shareholder of the company, would reduce this figure by $75,000, the original cost of the power contract. Thus the specific problem raised is whether, in computing the "earnings and profits" of the Lexington Holding Company under Section 333, the original cost of the power contract should be first deducted.

■ It should be noted that at no time during its existence did the Lexington Holding Company attempt to take any deduction for depreciation or amortization for amounts received under this contract, but reported all such sums as ordinary income. However it is clear that the practices of the company in reflecting the receipt of this income are not controlling for our purposes in determining the "earnings and profits" of the company on liquidation. Commissioner of Internal Revenue v. Wheeler, 1944, 324 U.S. 542, 65 S.Ct. 799, 89 L.Ed. 1166; Holmquist v. Blair, 8 Cir., 1929, 35 F.2d 10; Wood v. Commissioner, 3 T.C. 186.

For the purpose of taxing the stockholders on liquidation, earnings and profits are reconstructed to determine what properly should have been done.

In my opinion this case is one of those falling within the mandate of Burnet v. Logan, 1931, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143. There the taxpayer, in exchange for her stock in the company owning a long term lease on an iron ore field, received cash and a contract obligating the purchaser to pay her sixty cents for each ton of iron ore apportioned to her under a pre-existing apportionment arrangement. The United States Supreme Court held that before recognizing any taxable income under this contract, the taxpayer should first be permitted to recover her cost basis. The Court reasoned that the true value of the contract was based entirely upon the amount of ore which would be mined in the future and thus the amounts which the taxpayer might receive thereunder were contingent upon facts and circumstances not possible to foretell with anything like fair certainty. To this extent the contract had no ascertainable fair market value, the transaction was not a closed one and the taxpayer might never recoup her capital investment from payments only conditionally promised. Thus she was permitted first to recoup her cost out of the funds received under the agreement.

■ This decision is grounded upon the basic principle of Federal taxation that in determining taxable income or gain, the taxpayer will be allowed to recover his cost, either by amortization, depreciation, depletion or some other method.

"* * * in order to determine whether there has been gain or loss, and the amount of the gain if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration." Doyle v. Mitchell Bros. Co., 1918, 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054.

In my opinion the power contract is quite like the promise involved in the Logan case and should, therefore, receive similar treatment. Clearly the power agreement had no *ascertainable* fair market value and the indefinite amounts to be received thereunder were contingent upon facts and circumstances beyond the control of the taxpayer.

The defendant contends that the contract was, by its terms, perpetual and thus not subject to contingencies which could destroy its value. With this I cannot agree. The asset is a contract which, even though wrongfully, could have been repudiated and terminated at any time by the power company. The company could have become insolvent and ceased operations, or its successors might have refused to accept the obligation. Apparently it would be subject to regulation by the State Public Service Commission, a fact which casts a definite shadow over its perpetual nature. See Commissioner of Internal Revenue v. Edwards Drilling Company, 5 Cir., 1938, 95 F.2d 719. Finally, the power company was obligated to furnish power only from its plant site at Lake Murray. If generation at that plant had ceased or if the plant had been destroyed, the contract apparently would have terminated.

Other Courts, faced with similar contractual rights having no ascertainable value and subject to contingencies which could render them valueless, have permitted the taxpayer first to recover his capital outlay. Westover v. Smith, 9 Cir., 1949, 173 F.2d 90; Susan J. Carter, 9 T.C. 364, affirmed 2 Cir., 170 F.2d 911; Perry v. Commissioner, 8 Cir., 1945, 152 F.2d 183; Lentz v. Commissioner, 1957, 28 T.C. 1157; J. C. Bradford, 1954, 22 T.C. 1057. Defendant would distinguish these cases, and the Logan case, by its contention that they each involved a sale, a factor it contends is not present here. This is simply a question of terminology. The Lexington Holding Company acquired the power contract in exchange for cash, whereas Mrs. Logan acquired her contractual rights in exchange for stock. Each case raises the identical question of the treatment of money subsequently received under the contracts. It is the nature of the contractual right *acquired* by each of these taxpayers that is determinative.

Since the Lexington Holding Company was entitled to recover its cost of this contract before recognizing taxable income from amounts received pursuant to the agreement, this cost should be deducted from the company's "earnings and profits" in determining amounts distributable to the shareholders on liquidation. In this connection it is interesting to note that the defendant has already received taxes from the company, to which it was not entitled, on amounts received by the company under the contract equalling its cost. To deny this deduction here would permit the defendant to receive such unwarranted taxes twice.

For the foregoing reasons I make the following findings of fact and conclusions of law:

### Findings of Fact.

1. On February 1, 1913, G. A. Guignard, in exchange for certain properties and claims, entered into a contract with the South Carolina Power Company (now the South Carolina Electric & Gas Company) to receive 300 HP of electricity annually in perpetuity. Because of its nature this contract was subject to certain contingencies and uncertainties beyond the control of Guignard which made it impossible to determine its value and duration or the sums which would be realized thereunder.

2. G. A. Guignard died testate on or about July 18, 1926, leaving the beneficiaries of his estate undivided fractional interests in his residuary assets, including the power contract.

3. Prior to March 29, 1929, the heirs of G. A. Guignard formed the Lexington Holding Company, a South Carolina corporation, and on March 29, 1929, the Lexington Holding Company entered into a contract with the executors of the estate of G. A. Guignard to purchase the

principal assets of the estate at the value shown therein. Pursuant to this contract the Lexington Holding Company paid $75,000 for the power contract.

4. Following the acquisition of the power contract in 1929, the Lexington Holding Company received the 300 HP of electricity each year and, in turn, sold the power to available customers. Gross proceeds received from the sale of this power from March 29, 1929 until October 31, 1955, were $245,090.95. At no time did the company take any deduction for depreciation or amortization of the power contract and all amounts received thereunder were reported for tax purposes as ordinary income.

5. On October 31, 1955 the Lexington Holding Company was liquidated pursuant to Section 333 of the Internal Revenue Code of 1954. Upon liquidation, each shareholder received his or her pro-rata share of the corporate assets. At the time of liquidation, the plaintiff was a stockholder, having inherited her stock from two of the original heirs of the estate of G. A. Guignard.

6. The Commissioner of Internal Revenue determined that at the date of its liquidation the company had accumulated earnings and profits of $178,159.68, thereby refusing a deduction of $75,000 for the original cost of the power contract.

7. By reason of this determination, the Commissioner concluded that the plaintiff's ratable share of the company's earnings and profits totaled $25,879.85, rather than $15,050.97, as reported by the plaintiff and that her income from dividends for the calendar year 1955 should be increased in the amount of $10,828.88. As a result of these findings on April 11, 1958, the Commissioner levied a deficiency assessment against the plaintiff for the calendar year 1955 in the amount of $4,108.90, plus interest from April 15, 1956.

8. On or about August 25, 1958, the plaintiff paid the deficiency assessment in the amount of $4,108.90 plus interest in the amount of $570.91, together totaling $4,679.81.

### Conclusions of Law.

1. This Court has jurisdiction over the parties and the subject matter of this suit.

2. The value of the power contract between G. A. Guignard and the South Carolina Power Company was based upon contingent facts and circumstances beyond the control of Guignard or his successors and thus it had no ascertainable value. Therefore the doctrine of Burnet v. Logan, supra, is controlling and the company should first be permitted to recover the cost of the agreement before including any amounts received thereunder as taxable income.

3. The amount of accumulated earnings and profits of a liquidating company, for purposes of Section 333, is determined in accordance with proper treatment of items of income and expense, without regard to any erroneous manner in which they were actually handled by the company.

4. In determining that the Lexington Holding Company, on October 31, 1955, had earnings and profits accumulated after February 28, 1913, in the amount of $178,159.68, the Commissioner of Internal Revenue erroneously refused to deduct $75,000 representing the cost of the power contract to the Lexington Holding Company.

5. The Commissioner of Internal Revenue erroneously determined that the plaintiff's ratable share of the Lexington Holding Company's earnings and profits totaled $25,879.85.

6. The Commissioner of Internal Revenue erroneously determined that the plaintiff's income from dividends for the year 1955 should have been increased in the amount of $10,828.88.

7. The Commissioner of Internal Revenue erroneously levied a deficiency assessment against the plaintiff for the calendar year 1955 in the amount of $4,108.90 plus interest from April 15, 1956.

8. The plaintiff is entitled to judgment against the defendant in the amount of $4,679.81 plus interest from August 25, 1958.