APPEALS OF A. B. NICKEY & SONS, ESTATE OF A. B. NICKEY, W. E. NICKEY, AND S. M. NICKEY.

Docket Nos. 1235–1239, 1961, 1962, 1967. Submitted April 21, 22, 1925 Decided November 25, 1925.

> 1. Valuation of timber on March 1, 1913, for depletion purposes determined.
> 2. Under the evidence, *held*, that no taxable income was realized in the year 1917 from the liquidation of Nickey & Sons Co.

*Homer K. Jones, C. P. A.*, for the taxpayers.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before STERNHAGEN, TRAMMELL, PHILLIPS, and LOVE.

These appeals are from determinations of deficiencies in income and profits taxes for 1917, 1918, and 1919. The deficiencies arise from the disallowance of parts of deductions claimed by the partnership of A. B. Nickey & Sons as allowances for depletion of timber; from clerical errors whereby the taxpayers' incomes were erroneously increased, which errors were conceded at the hearing; and from the action of the Commissioner in adding to the gross incomes of

the Estate of A. B. Nickey, W. E. Nickey, and S. M. Nickey amounts received by them as liquidating dividends from Nickey & Sons Co. The above appeals were heard together and it was agreed that the testimony in each should be applicable to all, in so far as it is pertinent.

FINDINGS OF FACT.

A. B. Nickey & Sons is a partnership with its principal office at Memphis, Tenn. It was organized about the year 1894, and, from the date of its organization until August 4, 1917, was composed of A. B. Nickey and his two sons, S. M. Nickey and W. E. Nickey. A. B. Nickey died August 4, 1917. By consent of all the persons concerned, the business was continued as before and it still exists under the name A. B. Nickey & Sons, the Estate of A. B. Nickey taking his place in the distribution of earnings. It is and has been since its organization engaged in buying and selling hardwood timber. The partnership did not own any mills but purchased standing timber and sold it to the Green River Lumber Co., a corporation. Ninety-five per cent of the stock of the Green River Lumber Co. was owned by A. B. Nickey, S. M. Nickey, and W. E. Nickey in equal amounts. A. B. Nickey, S. M. Nickey, and W. E. Nickey were also officers and directors of the corporation.

During the year 1917, A. B. Nickey & Sons was the owner of a portion of a tract of land in northern Mississippi, known as the Marks tract. The tract originally contained 2,856 acres, of which 2,772 acres were timberland. The price paid for this land, including timber, was $37,500, or $13.13 per acre. The tract of land was divided into two parts by a railroad, about 600 acres thereof lying east of the railroad, all of which was sold prior to 1917 to the Green River Lumber Co. That part of the tract of timber lying east of the railroad, which was sold as above mentioned, was of greater value per acre than the remainder of the tract, due to the fact that the timber could be cut and marketed at a lower price. It also had a heavier stand of timber than the part lying west of the railroad. The timber upon a portion of the property lying west of the railroad was sold in 1917, 1918, and 1919.

The March 1, 1913, value of the timber which was cut in those years from the tract of land in question was $3.75 per 1,000 feet. There is no dispute between the taxpayers and the Commissioner as to the amount of timber cut in the years involved.

Nickey & Sons Co. was, during the years 1916 and 1917, a corporation having capital stock of the par value of $100,000, all of which was issued for cash. A. B. Nickey, S. M. Nickey, and W. E. Nickey were three of the incorporators of the company; each of them furnished $18,000 of its capital and each was a stockholder in the years

1916 and 1917. On January 10, 1916, the board of directors, by resolution, decided to dissolve the corporation and liquidate its assets. The corporation at that time had a surplus of $144,862.98. During the period January 10, 1916, to June 30, 1916, the corporation made an operating profit of $10,528.51, and distributed $90,000 in dividends, leaving a surplus of $65,391.49 on June 30, 1916. During the period June 30 to December 31, 1916, it showed a loss of $1,876.50, and $90,000 was distributed to the stockholders, leaving at December 31, 1916, no surplus and only $73,614.99 in the capital account. Of the amount remaining in the capital account at December 30, 1916, $5,503.72 was lost in the year 1917 through shrinkage in the value of assets, $68,000 was distributed to the stockholders during that year, and the balance, $111.27, was reserved to pay final expenses. The final expenses were paid and the charter of the corporation was surrendered in the year 1918. The Commissioner determined that each of the taxpayers W. E. Nickey and S. M. Nickey received in the year 1917 from the corporation liquidating dividends in the amount of $6,203.34; that A. B. Nickey received during the period January 1 to August 4, 1917, liquidating dividends in the amount of $4,763.34; and that the Estate of A. B. Nickey received liquidating dividends in the amount of $1,440, during the period August 5 to December 31, 1917, and he increased their respective incomes accordingly.

During the year 1919, S. M. Nickey and W. E. Nickey sold their interests in certain real estate known as the Sledge farm. In his return for that year, each of these taxpayers reported his profit from the sale of the Sledge farm as $824.56, which the Commissioner, upon audit of the return, increased to $3,845. At the hearing it was agreed by the taxpayers and the Commissioner that the profit of each taxpayer on this transaction, as computed by the Commissioner, should be reduced by the amount of $845.41.

At the hearing the Commissioner conceded that a clerical error was made in computing the net income of the partnership of A. B. Nickey & Sons for the year 1917 and that its income, as set forth in the deficiency letter, should be decreased by $16,375.03.

### DECISION.

The deficiencies should be computed in accordance with the following opinion. Final determination will be settled on 10 days' notice, under Rule 50.

### OPINION.

TRAMMELL: The Commissioner conceded at the hearing that the income of the partnership of A. B. Nickey & Sons for the year 1917, as computed and set forth in the deficiency letter, should be reduced

by the amount of $16,375.03, and that the income of the members of the partnership should be reduced *pro rata*, and, also, that the profit of each of the taxpayers W. E. Nickey and S. M. Nickey from the sale of the Sledge farm in the year 1919, as computed by the Commissioner, should be reduced by the amount of $845.41. These concessions leave for consideration only the question of the allowance to which the partnership of A. B. Nickey & Sons is entitled for depletion of timber sold in the years 1917, 1918, and 1919, and whether or not the taxpayers, W. E. Nickey, S. M. Nickey, A. B. Nickey and the estate of A. B. Nickey, realized any taxable income in the year 1917 from the liquidation of Nickey & Sons Co.

The taxpayers insist that the sale made by the partnership prior to the year 1917 to the Green River Lumber Co. established that the Marks tract contained, on March 1, 1913, 27,720,000 feet of timber of the value of $8.20 per 1,000 feet, and that in computing its allowance for depletion of that timber in the year 1917 and subsequent years it is entitled to use the rate of $8.20 per 1,000 feet.

The Commissioner contends that the sales to the Green River Lumber Co., prior to the year 1917, were not arm's length transactions, since the members of the partnership were in control of the Green River Lumber Co., and that an allowance for depletion of the timber involved computed at the rate of $3.75 per 1,000 feet of timber cut in 1917 and subsequent years is adequate.

We have carefully considered the evidence presented by the taxpayer in this appeal and we do not think that it has sufficient probative value to warrant us in changing the allowance for depletion made by the Commissioner. The burden is upon the taxpayer to establish by competent evidence that the tract of timber in question had a value on March 1, 1913, other than the value determined by the Commissioner, before this Board would be justified in holding that the Commissioner's determination was erroneously made. This the taxpayer has failed to do. The taxpayer relied upon sales of other timber in the territory in which the Marks Tract was located as establishing the value of the timber in question. Testimony was introduced to the effect that early in 1913 the partnership sold to the Green River Lumber Co. the timber on 460 acres included in the 600 acres, which was a part of the Marks Tract as originally acquired, under an oral contract whereby the Green River Lumber Co. was given the right to enter upon the land and cut and remove the timber, the amount of timber removed and the price to be paid therefor to be determined at the end of each six months. The timber so sold was cut and removed during 1913 and it averaged 9,765 feet per acre, for which the corporation paid the partnership at the rate of $7.03 per 1,000 feet. The amount fixed and paid at the end of each six-month period was based upon the

average price paid for logs during that period on the Memphis, Tenn., market. The timber on the remaining 160 acres east of the railroad was sold to the Green River Lumber Co. in 1914 on the same terms as the timber on the 460 acres. The sale in the year 1913 to the Green River Lumber Co. did not, in our opinion, reflect the value of the standing timber on the Marks Tract and should not be used as a basis for that purpose. It was a sale of the timber on a part of the tract made by the taxpayer to a corporation controlled and practically owned by its several partners. The corporation did not buy the timber standing *en bloc*, but merely acquired the right to cut and remove the timber, and to pay for it at the end of each six months at a price then determined. It is obvious that the corporation did not assume the same risks and obligations that a purchaser of standing timber usually incurs or assumes, and that the price actually paid for the timber after it had been cut and removed can not be considered as the fair market value of the timber in place. Furthermore, the timber sold in 1913 to the Green River Lumber Co. was located on the most accessible part of the tract and the most of it was of a heavier stand than the remainder of the tract. Assuming that the sale in 1913 was an arm's length transaction, which we do not hold, it was not such a sale as would fairly reflect the value of the entire tract of standing timber at that time.

The taxpayer also introduced evidence of the sale of timber in 1913 to Taylor and Crate by the Fish-Lamb Lumber Co. The timber on a tract of about 2,500 acres of land in the vicinity of the Marks tract was sold for approximately $93,000. This tract of timber was somewhat inferior to the Marks tract but there was a freight differential of about $2 per 1,000 feet in its favor. The freight differential was offset to some extent by the fact that the timber on the Marks tract could be logged at a lower cost than the timber on the Fish-Lamb tract. The Fish-Lamb tract contained about 19,000,000 feet of timber, making the cost thereof to Taylor and Crate about $4.75 per 1,000 feet. The taxpayer also introduced evidence of the sale, in 1913 or the first part of 1914, of a large tract of timber located in the vicinity of the Marks tract for approximately $40 per acre for the land and timber.

The partnership did not at any time have a survey of the timber on the Marks tract made by a timber cruiser in order to determine the fair market value of the tract on March 1, 1913.

The value of the Marks tract of timber, as determined by the Commissioner, was arrived at after a careful cruise thereof made by an experienced timber cruiser and graduate forester. He accepted the taxpayer's figures as to the acreage sold in 1913 and 1914 and the amount of timber cut therefrom, and he made a

cruise of the uncut part of the tract, which seems to be the approved and accepted method of computing the footage of standing timber and is the basis upon which it is usually bought and sold. The value per acre of the timber involved here, as determined by him and as approved and adopted by the Commissioner, is equal to or possibly a little greater than the price at which other tracts of timber in the vicinity of the Marks tract were sold during the year 1913. We see no reason to disturb the determination of the Commissioner as to the value of the Marks tract of timber on March 1, 1913, or as to the rate at which the taxpayer's allowance for depletion thereof should be computed.

With reference to the remaining question presented, the evidence establishes that the directors of Nickey & Sons Co. decided on January 10, 1916, to dissolve the corporation and to liquidate its assets. At that time it had capital stock outstanding of the par value of $100,000, and it had a surplus of $144,862.98. Between January 10, 1916, and December 31, 1916, distributions were made to the stockholders, and on January 31, 1917, the corporation had no surplus and its capital account was reduced to $73,614.99. The balance remaining in the capital account was distributed to the stockholders during the year 1917.

In *Appeal of James Dobson*, 1 B. T. A. 1082, this Board held that distributions made in the year 1917 by a corporation in liquidation are within the provisions of section 31 (b) of the Revenue Act of 1916, added by section 1211 of the Revenue Act of 1917, and, to the extent that they are paid out of profits accumulated after March 1, 1913, are taxable as dividends; and that, where all profits were so distributed in 1917, any further distribution in the year 1918 must have been out of capital. In that appeal the Board said:

Considerable doubt arose as to the taxability of distributions of surplus accumulated prior to the adoption of the Sixteenth Amendment, both when made as ordinary dividends and when made as part of a general liquidation. The United States District Court, in January, 1916, and the Circuit Court of Appeals for the Eighth Circuit, on September 4, 1916, decided that such distributions, whether as ordinary dividends or in liquidation, were not taxable to the recipient stockholders. *Lynch* v. *Hornby*, 236 Fed. 661; *Lynch* v. *Turrish*, 236 Fed. 653. Before these cases reached the Supreme Court, the Revenue Acts of 1916 and 1917 had been passed and definitions of "dividends" were included in them. The Supreme Court, in *Lynch* v. *Hornby*, 247 U. S. 339, expressed the view that the new provisions were not intended to be declaratory of the intent of the 1913 Act, but rather constituted a concession to the equity of stockholders.

Section 2 (a) of the 1916 Act defined net income as including dividends, but contained this proviso:

"*Provided*, That the term 'dividends' as used in this title shall be held to mean any distribution made or ordered to be made by a corporation, joint-stock company, association, or insurance company, out of its earnings or

profits accrued since March first, nineteen hundred and thirteen, and payable to its shareholders, whether in cash or in stock of the corporation, joint-stock company, association, or insurance company, which stock dividend shall be considered income, to the amount of its cash value."

In the Revenue Act of 1917, section 2 (a) of the 1916 Act was amended by being repeated without the proviso, while the proviso was inserted as a new section 31 (a), and to it was added a new subsection, (b), as follows:

"(b) Any distribution made to the shareholders or members of a corporation, joint-stock company, or association, or insurance company, in the year nineteen hundred and seventeen, or subsequent tax years, shall be deemed to have been made from the most recently accumulated undivided profits or surplus, and shall constitute a part of the annual income of the distributee for the year in which received, and shall be taxed to the distributee at the rates prescribed by law for the years in which such profits or surplus were accumulated by the corporation, joint-stock company, association, or insurance company, but nothing herein shall be construed as taxing any earnings or profits accrued prior to March first, nineteen hundred and thirteen, but such earnings or profits may be distributed in stock dividends or otherwise, exempt from the tax, after the distribution of earnings and profits accrued since March first, nineteen hundred and thirteen, has been made. This subdivision shall not apply to any distribution made prior to August sixth, nineteen hundred and seventeen, out of earnings or profits accrued prior to March first, nineteen hundred and thirteen."

Subsequently, the Supreme Court, on June 3, 1918, affirmed *Lynch* v. *Turrish*, 247 U. S. 221, and reversed *Lynch* v. *Hornby*, 247 U. S. 339. Then, in the Revenue Act of 1918, approved February 24, 1919, Congress dropped those provisions of section 31 (b), *supra*, which taxed dividends at the rates in effect for the years in which the distributed profits had been earned, and added the provision of section 201 (c), as follows:

"(c) A dividend paid in stock of the corporation shall be considered income to the amount of the earnings or profits distributed. Amounts distributed in the liquidation of a corporation shall be treated as payments in exchange for stock or shares, and any gain or profit realized thereby shall be taxed to the distributee as other gains or profits."

In the circumstances, it would seem that Congress, when it passed the Acts of 1916 and 1917, intended to treat ordinary dividends and distributions in liquidation alike, as they had been treated by the District Court and the Circuit Court of Appeals, but in the 1918 Act decided to make a distinction between them as the Supreme Court had done in interpreting the 1913 Act. This being the case, we can hardly regard the provisions of section 201 (c) of the Act of 1918 as declaratory of the intent of the 1917 Act.

The 1917 Act, treating ordinary dividends and distributions in liquidation alike, provided that " *any distribution* * * * shall be deemed to have been made from the most recently accumulated undivided profits or surplus." And in " any distribution " must be included distributions made in liquidation as well as those made in ordinary course of business. The term distribution, in its commonly accepted meaning, certainly includes payments made to stockholders in liquidating a corporation. The Supreme Court so used it in its opinion in *Lynch* v. *Turrish*, *supra*.

The Revenue Act of 1916 is silent with respect to the assets out of which distributions by corporations should be deemed to have been made. However, we are of the opinion that, in the absence

of express statutory provisions directing otherwise, we should give the same effect to distributions made by a corporation during the year 1916 as to those made in the year 1917, namely, that they shall be deemed to have been made out of profits and surplus, rather than out of capital, so long as there were undivided profits and surplus existing. It follows that, in the year 1917, W. E. Nickey, S. M. Nickey, and A. B. Nickey had nothing left in Nickey & Sons Co., except an interest in undistributed capital, and, upon distribution thereof in 1917, they realized no taxable income.