258 F.2d 651
 103 U.S.App.D.C. 351
 Henry A. BERLINER, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Josephine M. BERLINER, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Robert B. FRANK, Trustee for Cora A. Berliner Cunningham, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Robert B. FRANK, Trustee for Josephine L. Berliner Vargas, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Robert B. FRANK, Trustee for Henry A. Berliner, Jr., Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
 Nos. 14024-14028.
 United States Court of Appeals District of Columbia Circuit.
 Argued Dec. 11, 1957.
Decided May 1, 1958, Writ of Certiorari Denied June 30,
1958, See 357 U.S. 937, 78 S.Ct. 1384.
 
 Mr. Bernard I. Nordlinger, Washington, D.C., with whom Messrs. Milton W. King, Wallace Luchs, Jr., Robert B. Frank and Charles Kershenbaum, Washington, D.C., were on the brief, for petitioners.
 Mr. W. David Huddle, Washington, D.C., also entered an appearance for petitioners.
 Mr. Henry E. Wixon, Asst. Corp. Counsel for the District of Columbia, with whom Messrs. Chester H. Gray, Corp. Counsel, Milton D. Korman, Principal Asst. Corp. Counsel, and Douglas H. Moore, Jr., Asst. Corp. Counsel, were on the brief, for respondent.
 Before FAHY, WASHINGTON and DANAHER, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 These cases arise under the income tax laws of the District of Columbia. They present the question whether amounts distributed in complete liquidation of a corporation, to the extent that those amounts exceed the cost of the stock and represent corporate earnings, are properly includible in the stockholders' gross income as a dividend under Section 47-1551c(m) of the District of Columbia Code (1951).
 
 
 2
 In 1937 the petitioners became common stockholders in the Engineering & Research Corporation ('Erco'), each paying to the company the full par value for his or her shares. On November 15, 1954, Erco sold its assets and business to ACF Industries, Inc. ('ACF'), for $3,000,000,[1] realizing a profit of $2,196,371.46 on the sale. On that date Erco had an earned surplus of $613,628.54, a substantial part of which represented earnings in 1954. Following the sale the profit of $2,196,371.46 also was reflected in and become a part of its earned surplus account. In December of 1954 Erco distributed to its common stockholders, pro rata on the stock owned by each, the cash and the ACF stock acquired on the sale of assets, reserving only the amounts required to retire its preferred stock and to pay liabilities not assumed by ACF. It was stipulated that, after excluding the amount of capital included in the distribution,[2] the remainder was paid out of surplus acquired from operating profits up to November 15, 1954, and surplus acquired from the proceeds of the sale of its business to ACF. Erco charged the distribution, after excluding the capital, to earned surplus; it had no paid-in or capital surplus.
 
 
 3
 In their 1954 income tax returns to the District of Columbia, the petitioning stockholders reported the distribution as a sale or exchange of their stock, a capital asset, resulting in a non-taxable gain. Deficiencies for 1954 were assessed against them, computed by including in taxable income as a dividend under Section 47-1551c(m) of the Code the amount distributed by Erco in complete liquidation, less an amount representing return of capital.[3] The taxpayers paid the taxes so assessed and petitioned for refunds. The District of Columbia Tax Court approved these assessments and denied refunds of the taxes so paid. The present petitions followed.
 
 
 4
 Section 47-1557a(a) of the Code includes 'dividends' within the definition of gross income. Section 47-1551c(m) defines a dividend as--
 
 
 5
 'any distribution made by a corporation (domestic or foreign) to its stockholders * * *, out of its earnings, profits, or surplus (other than paid-in surplus), whenever earned by the corporation and whether made in cash or any other property * * * and whether distributed prior to, during, upon, or after liquidation or dissolution of the corporation: * * *.'[4]
 
 
 6
 It was stipulated in writing before the Tax Court that the distribution, to the extent taxed, was paid out of surplus, and the evidence showed that Erco had only earned surplus, to which the distribution was charged. The taxpayers make no contention to the contrary here.[5] The distribution made by Erco, during or upon its liquidation, was thus out of 'its earnings, profits, or surplus,' earned in part from operations and in part on the sale of its assets in 1954. As such, it falls precisely within the statutory language and the imposition of the tax was required.
 
 
 7
 The correctness of this view is confirmed by reference to the history of the related Federal taxing provisions.[6] Commencing with the Revenue Act of 1916,[7] c. 463, 39 Stat. 757 (1917), a dividend was defined generally as any distribution out of earnings and profits accumulated after February 28, 1913,[8] with certain additions not relevant here, and this definition has continued until the present time.[9] The 1918 Act, the 1924 Act (but not the 1921 Act), and all subsequent acts including the present Code,[10] provide specifically that amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. Under such specific provisions a liquidating distribution is treated as the proceeds of an 'exchange' resulting in gain or loss to the stockholder-recipient, even though the distribution may include corporate earnings and profits, and even though without the specific provision the broad definition of dividends would include distributions in liquidation. See Hellmich v. Hellman, 1928, 276 U.S. 233, 236-237, 48 S.Ct. 244, 72 L.Ed. 544; White v. United States, 1938, 305 U.S. 281, 59 S.Ct. 179, 83 L.Ed. 172; Helvering v. Chester N. Weaver Co., 1938, 305 U.S. 293, 59 S.Ct. 185, 83 L.Ed. 180. But in the Revenue Acts of 1916, 1917, and 1921 there was no such specific provision as to the treatment of distributions in complete liquidation. In cases governed by those acts it has been uniformly held that distributions in liquidation, whether partial or complete, fell within the definition of a dividend to the extent that they represented accumulated earnings, and thus were properly taxable as a dividend.[11] The holdings under the 1921 Act are especially significant: they construed the general definition of a dividend unequivocally to include distributions of earnings in a liquidation, where the specific provision of the 1918 Act that distributions in liquidation are to be treated as paid in exchange for the stock was omitted from the 1921 Act. See particularly Commissioner of Internal Revenue v. Sansome, supra, note 11, 60 F.2d at page 932 and McCaughn v. McCahan, supra, note 11, 39 F.2d at page 4.
 
 
 8
 The District statute contains virtually the same definition of a dividend as the Federal statutes have contained since the 1916 Act, with the significant addition that in the District statute Congress included a specific provision that the term 'dividend' includes a distribution of earnings 'during, upon, or after liquidation.'[12] Had Congress intended that such a distribution be treated as an exchange, we think it would have omitted the reference to liquidating distributions in the definition of a dividend and would have included a provision similar to that which has appeared in the Federal statutes uninterruptedly since 1924. We must therefore reject the taxpayers' contention that the transaction should be held to be an exchange, the gain from which is excluded from gross income by Section 47-1557a(b)(11).[13]
 
 
 9
 The petitioners recognize that the statutory definition of a dividend is broad enough to include the liquidating distributions to them, after capital is excluded. But, petitioners argue, the statutory language should not be applied literally here to tax as a dividend the part of the distribution which represents earnings, because to do so would lead to results not intended by Congress. The foregoing discussion demands rejection of this argument. We note, however, that Congress was undoubtedly cognizant that either method of treatment might present some problems in application, cf. Magill, The Income Tax Liability of Dividends in Liquidation, 23 Mich.L.Rev. 565, 566-568 (1925), and that it purposely selected the method of taxing liquidating distributions of earnings as dividends for purposes of the District tax. The wisdom of such a choice is obvious, when the provisions of the District law relating to capital gains (D.C.Code, 47-1551c(l) and 47-1557a(b)(11)) are considered. If distributions like the present were treated as sales or exchanges of stock, as taxpayers argue they should be, some stockholders (those who had owned their stock for more than two years) would escape tax altogether on receipt of the corporate earnings whereas other stockholders would be taxed in full on receipt of exactly the same distribution of earnings merely because they had held their stock for only two years or less. Such a difference in treatment for the same distribution would hardly be justified by logic-- and, as we read the statutes, Congress has not authorized it. The argument that the distributions 'grew out of' the ownership of stock would be equally applicable to any distribution of earnings, including dividends in the ordinary course paid by corporations not in liquidation, and is hardly persuasive as a reason for holding these distributions not within the literal statutory language.
 
 
 10
 Finally, the taxpayers contend that the Fifth Amendment prohibits taxation as dividends of amounts distributed in liquidation to the extent that they represent corporate earnings. Their argument is two-fold: that to do so taxes the stockholder on the earnings of another entity, the corporation, and that it arbitrarily and capriciously provides a different treatment from that afforded stockholders who sell their stock to third persons. The first point, if accepted, would prohibit the taxation of any distribution of corporate earnings to a stockholder as a dividend. But, of course, the point cannot be accepted. Cf. United States v. Phellis, 1921, 257 U.S. 156, 169, 42 S.Ct. 63, 66 L.Ed. 180. In respect of the taxpayers here the argument overlooks the fact that the distributions not only returned to them their capital investments in full but also a substantial additional amount as a gain or profit. The question is whether the Fifth Amendment permits Congress to tax this profit as dividend income, when it also represented a distribution of corporate earnings. The courts have frequently recognized that a distribution of earnings in liquidation may rationally be treated as a dividend as well as an exchange.[14] It was constitutionally open to Congress to elect to tax the profit as a dividend for purposes of the District tax, just as it was constitutional for it to do so for purposes of the 1921 Federal Act. Commissioner of Internal Revenue v. Sansome, supra, note 11, 60 F.2d at page 932. Cf. Neild v. District of Columbia, 1940, 71 App.D.C. 306, 110 F.2d 246.
 
 
 11
 To be sure, this method of taxation provides a different treatment from that accorded to stockholders who sell their stock to third persons. But such a sale does not involve a distribution by the corporation of its earnings and capital in liquidation, and has no element of a dividend, unlike the distributions here.[15] It thus cannot be thought to be unreasonable or arbitrary to treat sales of stock to third persons as sales and to treat distributions in liquidation as dividends to the extent that earnings are included-- although such considerations are probably not relevant for purposes of the Fifth Amendment. Neild v. District of Columbia, supra, 71 App.D.C. at pages 318-320, 110 F.2d at pages 258-260.
 
 
 12
 Affirmed.
 
 
 13
 DANAHER, Circuit Judge (dissenting).
 
 
 14
 Deficiencies in income tax were asserted by the Assessor against the petitioners as individual resident taxpayers who had received cash and securities upon the liquidation of Engineering and Research Corporation, Maryland Corporation (ERCO), in which they had been stockholders.
 
 
 15
 An income tax may be levied upon the 'net income' of a taxpayer resident in the District, to be sure, but the words 'net income' are defined to mean 'the gross income of a taxpayer less the deductions allowed by this article.' D.C. Code 47-1557 (1951). In turn, the words 'gross income' by definition include, in part, income derived from 'dealings in property, whether real or personal, other than capital assets,' D.C.Code 47-1557a (1951). Certainly the shares in the hands of the stockholders constituted 'capital assets,'[1] whatever the value of those shares might be, since they were 'held by the taxpayer for more than two years.' D.C.Code 47-1551(c)(l) (1951). The Code further provides that 'gains from the sale or exchange of any capital asset as defined in this article' are capital gains, D.C.Code 47-1557(b)(11) (1951).[2]
 
 
 16
 The Tax Court concluded that the cash and securities distributed by ERCO constituted 'dividends' within the meaning of D.C.Code 47-1551c(m) (1951), which in pertinent part reads:
 
 
 17
 '(m) The word 'dividend' means any distribution made by a corporation (domestic or foreign) to its stockholders or members, out of its earnings, profits, or surplus (other than paid-in surplus), whenever earned by the corporation and whether made in cash or any other property * * * and whether distributed prior to, during, upon, or after liquidation or dissolution of the corporation: Provided, however, That in the case of any dividend which is distributed other than in cash or stock in the same class in the corporation and not exempted from tax under this article, the basis of tax to the recipient thereof shall be the market value of such property at the time of such distribution * * *.'
 
 
 18
 It seems to me that the key to the foregoing section, as here applied, must be found in the language 'whenever earned by the corporation.' I think the District Code, as amended in 1947, had been simply drawn, and intentionally so, in contradistinction from the far more complicated Internal Revenue Code. The draftsmen sought to reach a liquidation, whether it be partial or complete. They sought to avoid the many complications such as have arisen under the federal law.
 
 
 19
 The draftsmen knew that distributions 'in kind' have given rise to myriad problems under the federal law. See, e.g., Commissioner of Internal Revenue v. Hirshon Trust, 2 Cir., 1954, 213 F.2d 523, certiorari denied 1954, 348 U.S. 861, 75 S.Ct. 85, 99 L.Ed. 679. Thus, for the purposes of the tax law of the District of Columbia, as to distributions 'in kind,' they added the proviso, above noted, defining the taxpayer's 'basis' but only as to property so distributed which is 'not exempted from tax.' Surely Congress did not stultify itself by this deliberately selected language in this very section.
 
 
 20
 To recapitulate, Congress sought simply to class as dividends to stockholders the distribution of earnings, whenever paid out, and whether in complete or partial liquidation or dissolution or otherwise. Reverting to the definition of 'dividend,' we see that its reach applies to a distribution by a corporation of its property, whether it be cash or otherwise, if that distribution is made 'out of its earnings, profits, or surplus (other than paid-in surplus), whenever earned by the corporation.'[3]
 
 
 21
 I see no complexity inherent in the sweep of this language. The Tax Court said in its opinion that 'There can be no doubt that all of such items, with the exception of the $190,000 capital item, were surplus.' Thus the Tax Court treated the entire sum, whether in cash or stock, paid by ACF to ERCO other than paid-in capital, as 'surplus,' and hence as a dividend or 'surplus' income to the stockholders. I believe its error stems from its loose and all-inclusive classification of 'surplus,' without regard to the type of surplus. Obviously, the Code itself excludes 'paid-in surplus.' The term certainly must be taken to exclude unearned surplus, or that represented by appreciation in value. Mr. Justice Brandeis makes the point for me in his opinion in Edwards v. Douglas, 269 U.S. 204, at page 214, 46 S.Ct. 85, at page 88, 70 L.Ed. 235, where he says:
 
 
 22
 'The word 'surplus' is a term commonly employed in corporate finance and accounting to designate an account on corporate books. * * * The surplus account represents the net assets of a corporation in excess of all liabilities including its capital stock. This surplus may be 'paid-in surplus,' as where the stock is issued at a price above par. (In our case paid-in surplus is specifically excluded.) It may be 'earned surplus,' as where it was derived wholly from undistributed profits. (In our case, I deem at least $613,628.54 to be 'earned surplus,' specifically subject to tax.) Or it may, among other things, represent the increase in valuation of land or other assets made upon a revaluation of the company's fixed property.'[4]
 
 
 23
 I think the case should be remanded to the Tax Court for a determination of the several elements as separately distinguished by Mr. Justice Brandeis. The words 'surplus * * * whenever earned by the corporation' have not here been broken down by evidence of record.
 
 
 24
 The petitioners had been arguing that no part of the sum paid by ACF was subject to the deficiency tax here asserted. Yet it is perfectly clear that as at December 31, 1953, there was an earned surplus balance of $54,241.64. Again, the corporation between January 1 and November 15, 1954, had net income of $559,386.90. Surely these two items constituted earned surplus, within the meaning of the Code, subject to tax, when distributed, as 'dividends.' Exclusive of capital, the balance was represented by notes and accounts receivable, buildings and other fixed depreciable assets and inventories. There were contracts, work in process and other elements, no doubt. We do not know what they are or the value ascribed to them.
 
 
 25
 In short, between January, 1937, and November, 1954, the stockholders saw their capital investment grow. No doubt, some earnings were ploughed back. No doubt, some dividends were paid. But the experience of the corporation was one of progress. Its good will was enhanced. Its potential for doing business was expanded. Its management developed a product in demand under Government contract-- for all we know, the only such company in the nation in a specialty field.[5] The value of the stock increased accordingly in the hands of its holders, irrespective of what elements contributed to that enhanced value. Thus, it was that invested capital of $190,000 by the time of the ACF transaction represented asset value of $3 million. That amount, in what appears to have been an arm's-length transaction, was what ACF agreed to pay. The stockholders bound themselves expressly by contract not to use the ERCO name, or any similar name, and not for five years to compete with ACF, or even indirectly to become interested in a competitor. ACF saw value in that restriction and ERCO's shareholders were entitled to compensation for it. The contract with ERCO bound ACF to pay $3 million, and ERCO was bound to transfer and did transfer 'all of Seller's then existing assets and business, as a going concern, including, without limitation, all rights to the use of the name Engineering and Research Corporation (or any variant thereof) and all patents, applications for patents, trade-marks and licenses.'[6]
 
 
 26
 Then, upon liquidation, ERCO's stockholders surrendered their stock. They exchanged the value back of that stock for $3 million. To the extent that the amounts received thereafter constituted a distribution of surplus earned by the corporation, such amounts were dividends under the Code section here applicable. To the extent that such amounts so distributed reflected value, not earned, they also were properly carried on ERCO's books as surplus, possessing, within the meaning of the Code, a capital asset value when related to the stock in the hands of the shareholders. Whatever the exact tax consequences may be depends upon the elements back of that valuation, to be measured in terms of what portion was earned, and on this point no findings have been made. That there was some capital gain to the shareholders seems beyond peradventure.[7]
 
 
 27
 My colleagues recognize, I see, that if these stockholders had sold their stock to a third person, there would be no income tax because there would be no 'dividend,' as they construe the term. That is the way the law clearly points, they concede. Presumably the same result would follow had the stock been sold to ACF. Yet they observe that unless their construction of the term 'dividend' is here adopted, these stockholders will likewise not be required to pay an income tax on the unearned asset value included in the ERCO 'surplus.'
 
 
 28
 I think the result they deplore reflects precisely the purpose of the statute which presents a policy question with which we are not concerned. The 1947 amendment expanded the earlier language[8] so as to reach earnings or profits distributed upon liquidation or dissolution, but otherwise made no change in the principle. If a 'dividend' in a corporate liquidation is not a distribution of corporate earnings, but represents only a return of unearned increment, the stockholders have received no more in value than they had before surrendering their stock. They have merely exchanged their capital, the shares being evidence of their ownership, for the valuation itself, whether it be distributed in dollars or in property. The Code reaches corporate distributions out of earnings, whether distributed currently in a given tax year as a 'dividend' in the usual sense, or declared but not paid until later, or earned, but not distributed at any time until either by a partial or complete liquidation or dissolution. Thus equality of tax treatment is accorded to District residents as to income from corporate earnings. It seems to me the scheme of the statute in these several respects is completely clear.[9]
 
 
 29
 In sum, when the statute says that gross income shall not include capital gains resulting from the sale or exchange of capital assets as defined in the Code, it seems to me to assimilate that portion of the District law to the federal law with years of experience behind it. Thus shareholders in the District who wish to speculate must treat as ordinary income, gains on transactions in capital assets held for less than two years. But investors, who through a corporation help build asset value and whose holdings appreciate due to many valid causes, some, perhaps, wholly fortuitous, are bound upon liquidation of the corporate medium to pay a District income tax only upon such 'surplus' as shall have been earned by the corporation. Whatever may be the tax liability of shareholders, such as these, to the federal Government, I think their District liability has expressly and purposefully been limited.
 
 
 30
 I would remand for a determination of whatever facts may measure District income tax liability according to the criteria I have suggested.[10]
 
 
 
 [1]
 This amount was paid in substantial part in cash; the balance was made up by the issuance of 10,000 shares of ACF stock, valued at the stock's market value on the date the contract was closed. In addition to the payment of $3,000,000 for the assets, ACF assumed all of Erco's liabilities, with the exception of certain items specifically excluded by the sale contract
 
 
 [2]
 I.e., an amount equal to the original capital paid in (the par value of their common stock) by the stockholders
 
 
 [3]
 See footnote 2
 
 
 [4]
 A proviso to this section reads as follows:
 'Provided, however, That in the case of any dividend which is distributed other than in cash or stock in the same class in the corporation and not exempted from tax under this article, the basis of tax to the recipient thereof shall be the market value of such property at the time of such distribution. * * *' The only part of the dividend here involved which was distributed other than in cash was stock of ACF (not common stock of Erco), which was valued at its market value on the date of distribution as the proviso directs. Taxpayers have pointed out no provision of the income tax law, and we know of none, which exempts a dividend paid in property other than cash or stock of the same class in the paying company, here stock of another company, from tax. Taxpayers do rely on the provisions excluding from gross income the gains on sales or exchanges of capital assets, which will be discussed infra. Suffice it to say here that such exclusion provisions do not relate to the exemption from tax of the type of dividend referred to in the proviso.
 
 
 [5]
 Such a contention would not be sustainable. There was a gain by the corporation on the sale of its assets. For Federal tax purposes that gain may not have been taxable (cf. Int.Rev.Code of 1954, 337(a) and (b), 26 U.S.C.A. 337(a, b)), and if not recognized as taxable income would not be regarded as increasing Erco's earned surplus by virtue of a specific statutory enactment (Int.Rev. Code of 1954, 312(f)(1), 26 U.S.C.A. 312(f)(1)). But the District statute has no such provision as to the effect on earned surplus. Furthermore, we are not advised as to the status of the gain for District corporate income tax purposes. If the assets sold had been held for more than two years and if they were not stock in trade or inventoriable properties or held primarily for sale to customers in the ordinary course of the corporation's business, they would be capital assets as defined in D.C.Code, 47-1551c(l) and would be excluded from the statutory definition of gross income by D.C.Code, 47-1557a(b) (11). The corporation's balance sheet on the date of sale showed very substantial inventories so that at least a substantial part of the assets sold were not capital assets of the corporation, as defined by statute, and would have been within the broad definition of income contained in D.C.Code, 47-1557a(a). Cf. Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Eisner v. Macomber, 1920, 252 U.S. 189, 207, 40 S.Ct. 189, 64 L.Ed. 521. If some part of the assets sold were within the definition of capital assets of the corporation, which the evidence does not show, and thus were excluded from its income by the statutory definition of gross income, the gain allocable to such part would nevertheless probably be regarded as increasing its earned surplus account in the absence of a statutory provision or regulation to the contrary. Cf. Commissioner of Internal Revenue v. F. J. Young Corp., 3 Cir., 1939, 103 F.2d 137; Commissioner of Internal Revenue v. Wheeler, 324 U.S. 542, 65 S.Ct. 799, 89 L.Ed. 1166, rehearing denied 1945, 325 U.S. 892, 65 S.Ct. 1182, 89 L.Ed. 2004; 1 Mertens, Law of Federal Income Taxation, 9.32 and 9.38 (1956). In any event, the stipulation as to the source of the distribution makes such considerations unnecessary here
 
 
 [6]
 See generally 1 Mertens, Law of Federal Income Taxation, 9.63, 9.64, 9.66, 9.87, 9.88, and 9.89 (1956); Darrell, Corporate Liquidations and the Federal Income Tax, 89 U. of Pa.L.Rev. 907-909 (1941)
 
 
 [7]
 Section II, subd. B. of the Revenue Act of 1913, c. 16, 38 Stat. 167 (1915), the first act after adoption of the Sixteenth Amendment, included 'dividends' in gross income without attempting to define them. Lynch v. Turrish, 1918, 247 U.S. 221, 38 S.Ct. 537, 62 L.Ed. 1087, and Lynch v. Hornby, 1918, 247 U.S. 339, 38 S.Ct. 543, 62 L.Ed. 1149, were decided under this Act. Read together, they seem to indicate that the Court construed the word 'dividends' in that Act as referring to dividends paid in the ordinary course and as not including amounts distributed in complete liquidation of a corporation. But such a construction is not controlling here, where the statutory provisions are different
 
 
 [8]
 March 1, 1913, was the effective date of the first revenue act following ratification of the Sixteenth Amendment
 
 
 [9]
 See Int.Rev.Code of 1954, 316(a), 26 U.S.C.A. 316(a)
 
 
 [10]
 Int.Rev.Code of 1954, 331(a)(1), 26 U.S.C.A. 331(a)(1)
 
 
 [11]
 Under 1916 Act: A. B. Nickey & Sons, 1925, 3 B.T.A. 173
 1917 Act: James Dobson, 1925, 1 B.T.A. 1082; cf. Vincent v. McLaughlin, 9 Cir., 1932, 61 F.2d 657, petition for certiorari dismissed 1933, 288 U.S. 618, 53 S.Ct. 508, 77 L.Ed. 990.
 1921 Act: Commissioner of Internal Revenue v. Sansome, 2 Cir., 60 F.2d 931, certiorari denied sub nom. Sansome v. Burnet, 1932, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575; Phelps v. Commissioner, 7 Cir., 1931, 54 F.2d 289, certiorari denied 1932, 285 U.S. 558, 52 S.Ct. 458, 76 L.Ed. 946; Leland v. Commissioner, 1 Cir., 50 F.2d 523, certiorari denied 1931, 284 U.S. 656, 52 S.Ct. 34, 76 L.Ed. 557; McCaughn v. McCahan, 3 Cir., 1930, 39 F.2d 3; Hamilton Woolen Co., 1930, 21 B.T.A. 334; Frank D. Darrow, 1927, 8 B.T.A. 276; cf. Holmquist v. Blair, 8 Cir., 1929, 35 F.2d 10.
 
 
 [12]
 See Section 47-1551c(m), above quoted. The provision with which we are here concerned was enacted in 1947. Previously, the 1939 tax act defined the word 'dividend' as 'any distribution made by a corporation out of its earnings or profits * * *', and provided:
 'It includes such portion of the assets of a corporation distributed at the time of dissolution as are in effect a distrubution time of dissolution as are in effect a distribution 47-1543(16) (Supp. V, 1956).
 The change in the 1947 Act seems to us to have been adopted to eliminate the necessity of a finding that a distribution is 'in effect' a distribution of earnings, when some of the assets distributed represent earned surplus.
 
 
 [13]
 It is here relevant to note that if these distributions are considered to be 'gains from the sale or exchange of any capital asset,' as defined in D.C.Code, 47-1557a(b)(11) and 47-1551c(l), they would escape District tax entirely. This is in contrast to the Federal statutes which do not exempt capital gains but tax them in a special way. See Int.Rev. Code of 1954, 1201 et seq. 26 U.S.C.A. 1201 et seq
 
 
 [14]
 See, e.g., cases cited in footnote 11; Hellmich v. Hellman, 1928, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544; Magill, supra, 23 Mich.L.Rev. at pages 566-568
 
 
 [15]
 We do not think that the same could necessarily be said of a sale of stock back to the issuing corporation itself. It may be that in some circumstances such a sale would amount to a partial (or even a complete) liquidation. We make no comment as to the possible tax consequences of a sale by the stockholders of all ERCO stock to another corporation, such as ACF
 
 
 [1]
 Garrett v. District of Columbia, 1946, 81 U.S.App.D.C. 374, 159 F.2d 457, certiorari denied 1947, 330 U.S. 835, 67 S.Ct. 971, 91 L.Ed. 1282
 
 
 [2]
 The general definitions in the Code 'are the generally accepted ones for the words defined.' S.Rep.No.280 to accompany H.R. 3737, Vol. 2 Senate Reports (1947) 80th Cong., 1st Sess
 
 
 [3]
 Compare D.C.Code 47-1543(16) (1940):
 'The word 'dividend' means any distribution made by a corporation out of its earnings or profits to its stockholders or members whether such distribution be made in cash, or any other property, other than stock of the same class in the corporation. It includes such portion of the assets of a corporation distributed at the time of dissolution as are in effect a distribution of earnings.'
 
 
 [4]
 So it was that the parties stipulated that over and above repaid capital, amounts received by the stockholders were 'paid and delivered out of surplus of (ERCO) and to have been acquired by said corporation from (1) its operations commencing January, 1937, and terminating November 15, 1954, and (2) the proceeds of sale of its business to ACF * * *.'
 
 
 [5]
 As to the nature of at least some of ERCO's business, see Greene v. McElroy, 1958, 103 U.S.App.D.C. 87, 254 F.2d 944
 
 
 [6]
 ERCO's contract to sell its business in which the stockholders individually joined, bound ERCO to transfer to ACF net assets of not less than '$586,429, the net worth of Seller as disclosed by its (balance sheet). The term 'net assets' of Seller as used in this Section shall be deemed to mean the book value of the assets of Seller less its liabilities, including in liabilities all reserves and accruals but excluding capital and surplus accounts.'
 
 
 [7]
 I do not explore the extent to which these stockholders may be liable to federal taxes because of the distribution, and, of course, we have not considered at all the various aspects of ERCO's liability to the Government
 
 
 [8]
 See note 3 supra
 
 
 [9]
 The Assessor had issued no regulations which spell out the term 'dividend.' I am confident my colleagues will not wish to be understood as saying that a 'dividend,' as they define it, will result in taxability as though upon income if a stockholder takes a loss when a corporation upon liquidation returns less than his invested capital. The point is arguable, nevertheless. I read the majority opinion as intended to deal only with the distribution of amounts which 'exceed the cost of the stock and represent corporate earnings.' I have sought to make clear for my part that 'surplus' may mean a great deal more than what has been earned by the corporation, and may include amounts which 'exceed the cost of the stock.' There must be hundreds of corporations in the District-- not to mention corporations located elsewhere-- whose stock is owned by District residents, the holdings of which are concentrated in real estate, or oil properties or mining ventures, for purposes of illustration, which vastly appreciated in value in recent years. That increment in value is surplus, largely unearned. See Edwards v. Douglas, supra
 
 
 [10]
 See Commissioner of Internal Revenue v. Munter, 1947, 331 U.S. 210, 216, 217, 67 S.Ct. 1175, 91 L.Ed. 1441