433 F.2d 461
 John H. VERKOUTEREN, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Herman OSHINSKY, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Mary OSHINSKY, William Oshinsky and Clara Sennet, Executors of the Estate of Charles Oshinsky, Deceased, Petitioners,
v.
DISTRICT OF COLUMBIA, Respondent.
William OSHINSKY, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Herman FENICHEL, Petitioner,
v.
DISTRICT OF COLUMBIA, Respondent.
Bernard MARGOLIUS and Lilyan Margolius, Petitioners,
v.
DISTRICT OF COLUMBIA, Respondent.
 Nos. 20889-20894.
 United States Court of Appeals District of Columbia Circuit.
 Argued November 8, 1967.
 Decided February 6, 1969.
 Reargued en banc June 19, 1969.
 Decided June 11, 1970.
 As Amended January 6, 1971.
 
 Mr. Joel N. Simon, Washington, D. C., with whom Mr. Albert E. Arent, Washington, D. C., was on the brief, for petitioners.
 Mr. Henry E. Wixon, Asst. Corporation Counsel, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Robert C. Findlay, Asst. Corporation Counsel, were on the brief, for respondent.
 Mr. David E. Birenbaum, Washington, D. C., filed a brief on behalf of Watergate Realty, Inc., as amicus curiae.
 ON REHEARING EN BANC
 Before FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, sitting en banc.
 PER CURIAM:
 
 
 1
 The court, by a divided vote, reinstates the decision of the panel issued February 6, 1969. The issue is one of local law, and the rule for the future has in any event been specified by the amendments effected by the District of Columbia Revenue Act of 1969, 83 Stat. 176 (1969). While the various issues discussed by counsel in their briefs and argument en banc have been carefully considered, we think the case is an appropriate one for invoking Local Rule 13(c), and for announcing the judgment en banc without detailed exposition en banc of the legal points beyond that already provided in the majority and minority opinions of the panel.
 
 
 2
 Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBINSON, Circuit Judges.
 
 
 3
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge.
 
 
 4
 Capitol Hotel Enterprises, Inc. (Capitol) was organized in 1948 and, until its dissolution in 1960, owned and managed investment properties situated in the District of Columbia. At its inception, petitioners, by investment of $720 of Capitol's $1,200 total capitalization, became holders of three-fifths of its common stock,[1] and this stock they retained until its liquidation. During 1948, Capitol purchased stock in Chastleton Hotel, Inc. (Chastleton) for $20,480,[2] and until dissolution carried it on its books at that figure.
 
 
 5
 When Capitol dissolved in 1960, the book value of its assets was $101,021.30, consisting of notes receivable, accrued interest, and the Chastleton stock.[3] With no liabilities, Capitol's net worth appeared on its books at $1,200 in paid-in capital and $99,821.30 in earned surplus. Book values of the notes and interest were equal to their fair market values,[4] but over the twelve years since its purchase the Chastleton stock had appreciated from $20,480 to a fair market value of $390,000.
 
 
 6
 Petitioners acquired on Capitol's liquidation three-fifths of its assets actually worth $282,324.78, including three-fifths of the Chastleton stock having a market value of $234,000.[5] Three days thereafter, they joined with Capitol's other former stockholders in a sale, at the price of $390,000, of all of the Chastleton stock Capitol had previously owned. From the sale petitioners received $234,000[6] as their pro rata portion of its proceeds.
 
 
 7
 Petitioners, all individual residents of the District during 1960, filed cash-basis District income tax returns for that year, but omitted Capitol's liquidating shares. Upon a subsequent examination of their returns, the assessing authority revised each petitioner's tax liability by adding to the taxable income reported, in the ratio of his ownership of Capitol's stock, a portion of Capitol's earned surplus and a portion of the profit on the Chastleton stock sale. The aggregate gain on that sale was computed at $369,520, being the sale price of $390,000 minus the $20,480 originally paid for it. Tax deficiencies were assessed accordingly and were paid.
 
 
 8
 Petitioners then filed suit in the District of Columbia Tax Court challenging so much of the additional assessments as was based on the gain from sale of the Chastleton stock.[7] The Tax Court upheld the assessments upon a finding that for tax purposes the stock had been constructively sold by Capitol and not by the stockholders. That finding contravened a stipulation by the parties that the stockholders had effected the sale. For that reason, upon earlier appeals here, we reversed and remanded the cases to the Tax Court for its decision on petitioners' additional taxability on the premise stipulated.[8] On remand, the Tax Court again affirmed the assessments, and the cases are back for further review.
 
 
 9
 Thus once again we are brought face-to-face with the need to construe and apply the District of Columbia income tax laws in the resolution of difficult questions of far-reaching significance. In the performance of this duty, we take the statutory provisions as we find them, utilize our past interpretive decisions as we understand them and, "albeit with Congressional illumination of a very faint order indeed,"[9] arrive at the conclusions that seem to achieve the underlying legislative objectives. That process leads us to affirmance of the decisions from which the appeals before us were taken.
 
 
 10
 * To the extent that Capitol's liquidating shares represented its earned surplus, they were properly considered to be "dividends" constituting gross income to the recipient stockholders. By statute it is so provided,[10] our decisions so hold,[11] and petitioners concede the validity of so much of the assessments.[12]
 
 
 11
 But the Chastleton stock which Capitol distributed in kind falls into a different category. The increase in the stock's value while in Capitol's portfolio was unrealized, and never became a part of its "earnings, profits, or surplus."[13] The Chastleton stock, then, did not become a dividend upon its receipt by Capitol's stockholders, even to the extent of its appreciation in value after Capitol's acquisition.[14] For the treatment it was properly to be given, we must consult other relevant provisions of the tax laws.
 
 
 12
 The District's income tax is imposed generally upon the entire net income of a resident individual in excess of his personal exemptions and credits for dependents.[15] Net income is defined as gross income less allowable deductions.[16] Gross income includes "income derived from * * * sales or dealings in property, whether real or personal, other than capital assets * * *, growing out of the * * * sale of * * * such property * * *."[17] The single exclusion from gross income at all pertinent to this case is of "[g]ains from the sale or exchange of any capital assets."[18] A capital asset, with exceptions immaterial here, is "any property * * * held by the taxpayer for more than two years * * *."[19] Thus the gain from petitioners' sale of the Chastleton stock was gross income unless they held stock as a capital asset.
 
 
 13
 Had petitioners sold or exchanged their Capitol stock at a profit, the gain would not have been includible as gross income. Had Capitol itself made a profitable sale or exchange of the Chastleton stock, the profit would have been nontaxable to it. The result in each instance would flow from the fact that the subject of the disposition, while in the ownership of the disposer, was a capital asset, gains from the sale or exchange of which are excluded from gross income.
 
 
 14
 But our case is different. It involves neither a sale or exchange by Capitol of the Chastleton stock nor a sale or exchange by petitioners of their Capitol stock. It is concerned with petitioners' sale of the Chastleton stock after its untaxed distribution to them. We conclude that the Chastleton stock, having been held by petitioners for only three days before the sale, was not a capital asset in their hands.
 
 
 15
 Capitol was not the alter ego of its shareholding community, but a tax entity distinct from its stockholders.[20] Assets demand independent tax treatment — perhaps differing treatment — according to whether they belong to the corporation, ongoing or dissolved, or to its stockholders. We find nothing in the District's tax statute purporting to classify, from the stockholder's standpoint, distributed property as a capital asset simply by reason of its prior tax status as such while in corporate ownership. Nor did the fact that the Capitol stock was retained by the stockholders for more than two years, and thus became a capital asset, mean that the Chastleton stock, which they kept for only three days, also was a capital asset to them.
 
 
 16
 The words "capital assets" are defined in terms of property "held by the taxpayer."[21] That description characterizes aptly Capitol's proprietorship of the Chastleton stock before Capitol's dissolution. But Capitol's stockholders, merely because they held the aggregate beneficial interest in the corporate enterprise, did not bear that degree of relationship to the corporate assets prior to the liquidation. As we see it, Capitol's stockholders acquired the Chastleton stock in the type of ownership prerequisite to a capital asset holding only upon its distribution to them, three days before they sold it.
 
 
 17
 Unlike our dissenting colleague,[22] we do not find support for a contrary position in our Goldman decision.[23] There the majority of the court held that distributions from corporate depreciation reserves, irrespective of whether they exceeded investments in the corporation's stock, were capital payments and not gross income to the distributees under Section 47-1557a.[24] That determination is inapposite, for it treats an issue not before us in this case. The question here is not the taxability of the Chastleton stock upon its receipt by petitioners, but the taxability of the profit upon its subsequent sale by petitioners three days after its untaxed distribution to them.[25]
 
 
 18
 As we understand Goldman, it decided that the involved distributions were nontaxable, not because the stockholders held their corporate stock as capital assets, but on the ground that the distributions did not constitute gross income at all.[26] The capital asset exclusion was referred to in the majority opinion merely as one of several illustrations to support the conclusion that the expression "income from any source whatever" in Section 47-1557a[27] did not sweep all profits into gross income. In other words, there are exceptions, and a distribution from a depreciation reserve was held to be one such exception.
 
 
 19
 Moreover, the capital gain exclusion is limited in operation to transactions involving a "sale or exchange" of a capital asset.[28] While stock held for more than two years is clearly a capital asset, we have consistently held that distributions to stockholders from the corporation's capital, although accompanied by extinction of all outstanding stock in the corporation, are neither sales nor exchanges.[29] We feel compelled to avoid a reading of Goldman that would impinge upon the statutory language and our prior decisions.
 
 
 20
 Nonrecognition either of gain or loss should not be expanded by implication beyond the fair intendment of statutory authority. The general policy of the law is to tax gains and exclusions are not broadly construed.[30] The District's capital gain exclusion is generous to taxpayers and the public interest argues against enlarging it.[31] In our view, neither the period a corporation holds distributed property nor the period a stockholder holds his stock in the distributing corporation is the criterion in the District for measuring the duration of his ownership to ascertain whether for him it is a capital asset.
 
 II
 
 21
 From plain statutory specifications, we derive the formula for computation of the amount includible as gross income in consequence of the sale of the Chastleton stock. Section 47-1583a of the District's income tax laws provides:
 
 
 22
 The gain or loss, as the case may be, from the sale or other disposition of property shall be the difference between (a) the amount realized from such sale or other disposition of the property and (b) the basis as defined in section 47-1583.
 
 
 23
 And Section 47-1583, with exceptions inapplicable to this case, provides:
 
 
 24
 The basis for determining the gain or loss from the sale, exchange, or other disposition of property shall be the cost of such property * * *.
 
 
 25
 Read together, these provisions mean that petitioners' gain was their share of the sale price of the stock less the cost to them of the stock they sold.
 
 
 26
 We cannot accept the proposition that the market value of the Capitol stock which petitioners relinquished upon Capitol's dissolution represented their cost of the Chastleton stock which they then obtained and later sold.[32] The distributed Chastleton stock was not a dividend to petitioners, and so could not on that account take on market value as its basis for purposes of subsequent sale.[33] Nor was the distribution of the Chastleton stock and simultaneous surrender of the Capitol stock a sale or exchange,[34] for which the value of the acquired stock might be its quid pro quo.
 
 
 27
 It was the unrealized pre-liquidation market value of the Chastleton stock that produced predominantly the market value of the Capitol stock. So much of the market value of the Capitol stock as arose from the market value of the Chastleton stock could not be petitioners' cost of the latter stock, for they incurred no cost in yielding up the Capitol stock for the very thing that increased its value. And neither Capitol during its ownership, nor petitioners upon their acquisition, paid any income taxes on the great price advance of the Chastleton stock.
 
 
 28
 The cost of the Chastleton stock to Capitol concededly was $20,480. Upon its transfer to petitioners on Capitol's dissolution, that was also its book value, reflected wholly in Capitol's earned surplus.[35] Accordingly, on distribution of Capitol's assets, including the Chastleton stock, petitioners' pro rata share of the $20,480 was determined by the District's assessing authority to be part of petitioners' taxable dividend. Petitioners accepted the assessor's ruling on that score, and the Tax Court approved it.
 
 
 29
 But this $20,480 — the value of the Chastleton stock the Capitol stockholders realized through the dividend[36] — was not received in cash or other tangible form; the stock itself was received. At the same time, petitioners were charged with a ratable portion of the $20,480 dividend equaling the earned surplus of the Chastleton stock. When they sold the stock for $390,000, the assessor treated the amount of this dividend as petitioner's cost in determining their gain, and the Tax Court approved.
 
 
 30
 In this we think the assessor and the Tax Court were entirely correct. Capitol purchased the Chastleton stock for only $20,480, and neither Capitol nor its stockholders paid any income tax on its appreciated market value because during Capitol's ownership the gain was unrealized. And the stockholders' true and only cost of that stock was the $20,480 portion of the taxable liquidating dividend that was attributable to the Chastleton stock.[37] By the same token, unless the $20,480 was deemed to be the stockholders' cost of the Chastleton stock, they would have been twice subjected to income taxes on it. Double taxation in any form is an interpretive conclusion that is to be avoided unless manifestly required.[38] We believe that a construction of Section 47-1583 equating "cost" to the $20,480 taxed as a dividend in this case is fully consistent with legislative goals.[39]
 
 
 31
 Had Capitol, prior to dissolution, sold the Chastleton stock at the $390,000 price and then distributed liquidating dividends to its stockholders, the latter would have become liable for District income taxes thereon to the extent that the liquidating shares represented Capitol's profit on such sale.[40] Petitioners realized in 1960 — three days after the distribution — more than $280,000 on the $720 investment they made in 1948. Only on the $20,480, reflecting Capitol's cost of the Chastleton stock, which was included in the liquidating dividend, have either Capitol or petitioners paid any income taxes on the Chastleton stock transaction. A holding that their enormous financial advance is otherwise completely nontaxable would open a loophole of considerable magnitude in the District's income tax laws. This, in our judgment. Congress hardly intended.[41]
 
 
 32
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Petitioners then acquired 300 shares of Capitol's common stock. On Capitol's dissolution, 500 shares of its common stock, the only class of capital stock authorized, were issued and outstanding
 
 
 [2]
 Capitol paid $20,000 for 200 shares of Chastleton's preferred stock, and $480 for 480 shares of its common stock
 
 
 [3]
 The individual book values were $76,603.80 for the notes, $3,937.50 in interest, and $20,480 for the Chastleton stock
 
 
 [4]
 See note 3,supra.
 
 
 [5]
 Petitioners received 120 of the 200 preferred shares, and 288 of the 480 common shares
 
 
 [6]
 The price was paid partly in cash and partly by the purchaser's one-year promissory note
 
 
 [7]
 Petitioners do not contest the assessments insofar as they are predicated upon the distributions from Capitol's earned surplus. See also notes 10-11,infra, and accompanying text.
 
 
 [8]
 Verkouteren v. District of Columbia, 120 U.S.App.D.C. 361, 346 F.2d 842 (1965). See also Alper v. District of Columbia, 120 U.S.App.D.C. 364, 346 F.2d 845 (1965)
 
 
 [9]
 Oppenheimer v. District of Columbia (Oppenheimer II), 124 U.S.App.D.C. 221, 222, 363 F.2d 708, 709 (1966). In that case we also said: "There are a number of anomalies inherent in residence in the District of Columbia, but none is more striking than that of being simultaneously subjected to differing schemes of income taxation devised by the same legislature. The resulting confusion plagues taxpayer, tax collector, and court alike. This review of a decision of the District of Columbia Tax Court does not lessen the problem, nor is anything likely to do so short of a Congressional determination that one income tax structure at a time is enough for any legislative body to erect for those under its jurisdiction."Id. at 222, 363 F.2d at 709.
 
 
 [10]
 "The word `dividend' means any distribution made by a corporation (domestic or foreign) to its stockholders or members, out of its earnings, profits, or surplus (other than paid-in surplus), whenever earned by the corporation and whether made in cash or any other property (other than stock of the same class in the corporation if the recipient of such stock dividend has neither received nor exercised an option to receive such dividend in cash or in property other than stock instead of stock) and whether distributed prior to, during, upon, or after liquidation or dissolution of the corporation:Provided, however, That in the case of any dividend which is distributed other than in cash or stock in the same class in the corporation and not exempted from tax under this subchapter, the basis of tax to the recipient thereof shall be the market value of such property at the time of such distribution: And provided, however, That the word `dividend' shall not include any dividend paid by a mutual life insurance company to its shareholders." D.C.Code § 47-1551c(m) (1967 ed.).
 
 
 [11]
 Berliner v. District of Columbia, 103 U.S.App.D.C. 351, 258 F.2d 651, cert. denied 357 U.S. 937, 78 S.Ct. 1384, 2 L.Ed.2d 1551 (1958). See also Oppenheimer II,supra, note 9, 124 U.S.App. D.C. at 223, 363 F.2d at 710; Doyle v. District of Columbia, 124 U.S.App.D.C. 207, 363 F.2d 694 (1966); Snow v. District of Columbia, 124 U.S.App.D.C. 69, 71-72, 361 F.2d 523, 525-526 (1966); Estate of Uline v. District of Columbia, 124 U.S.App.D.C. 5, 360 F.2d 820 (1966); Bord v. District of Columbia, 120 U.S.App.D.C. 175, 177, 344 F.2d 560, 562 (1965).
 
 
 [12]
 See note 7,supra.
 
 
 [13]
 D.C.Code § 47-1551c(m) (1967 ed.), quotedsupra note 10.
 
 
 [14]
 District of Columbia v. Oppenheimer (Oppenheimer I), 112 U.S.App.D.C. 239, 301 F.2d 563 (1962). See also Oppenheimer II,supra note 9, 124 U.S.App. D.C. at 223, 363 F.2d at 710; Estate of Uline v. District of Columbia, supra note 11, 124 U.S.App.D.C. at 7, 360 F.2d at 822; Bord v. District of Columbia, supra note 11, 120 U.S.App.D.C. at 177, 178 n. 6, 344 F.2d at 562, 563 n. 6.
 
 
 [15]
 D.C.Code §§ 47-1567, 47-1567b (1967 ed.)
 
 
 [16]
 D.C.Code § 47-1557 (1967 ed.)
 
 
 [17]
 "The words `gross income' include gains, profits, and income derived from salaries, wages, or compensation for personal services of whatever kind and in whatever form paid, including salaries, wages, and compensation paid by the United States to its officers and employees to the extent the same is not exempt under this subchapter, or income derived from any trade or business or sales or dealings in property, whether real or personal, other than capital assets as defined in this subchapter, growing out of the ownership, or sale of, or interest in, such property; also from rent, royalties, interest, dividends, securities, or transactions of any trade or business carried on for gain or profit, or gains or profits, and income derived from any source whatever." D.C.Code § 47-1557a(a) (1967 ed.)
 
 
 [18]
 D.C.Code § 1557a(b) (11) (1967 ed.). And losses from the sale or exchange of a capital asset are not allowed in computing net income. D.C.Code § 1557b(b) (6) (1967 ed.)
 
 
 [19]
 "The words `capital assets' mean any property, whether real or personal, tangible or intangible, held by the taxpayer for more than two years (whether or not connected with his trade or business), but do not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the end of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." D.C.Code § 47-1551c (l) (1967 ed.).
 
 
 [20]
 See D.C.Code §§ 47-1571, 47-1571a (1967 ed.)
 
 
 [21]
 D.C.Code § 47-1551c(l) (1967 ed.), quoted supra note 19.
 
 
 [22]
 Infra pp. 468-478.
 
 
 [23]
 District of Columbia v. Goldman, 117 U.S.App.D.C. 219, 328 F.2d 520 (1963)
 
 
 [24]
 Quotedsupra note 17.
 
 
 [25]
 Compare Snow v. District of Columbia,supra note 11.
 
 
 [26]
 We note, too, that petitioners, although urging the theory espoused in dissent, do not rely uponGoldman or even cite it in their briefs.
 
 
 [27]
 Quotedsupra note 17.
 
 
 [28]
 D.C.Code § 1557a(b) (11) (1967 ed.), quoted in the textsupra at note 18.
 
 
 [29]
 Oppenheimer II,supra note 9, 124 U.S. App.D.C. at 224, 363 F.2d at 711; Doyle v. District of Columbia, supra note 11; Estate of Uline v. District of Columbia, supra note 11, 124 U.S.App.D.C. at 7, 360 F.2d at 822; Berliner v. District of Columbia, supra note 11, 103 U.S.App. D.C. at 353-356, 258 F.2d at 653-656. This differs radically, of course, from the statutory assimilation of the transaction to an exchange in federal income tax law. Int.Rev.Code of 1954, § 31(a), 26 U.S.C. § 331(a) (1964). The differences, doctrinal as well as substantive, between federal and District law in this regard and with respect to capital assets mean that analogies may not provide a firm decisional foundation. Compare Berliner v. District of Columbia, supra note 11, 103 U.S. App.D.C. at 354-355, 258 F.2d at 654-655; Eastman Kodak Co. v. District of Columbia, 76 U.S.App.D.C. 339, 341, 131 F.2d 347, 349 (1942).
 
 
 [30]
 "The intent to exclude must be definitely expressed, where, as here, the general language of the act laying the tax is broad enough to include the subject-matter." Choteau v. Burnet, 283 U.S. 691, 696, 51 S.Ct. 598, 601, 75 L.Ed. 1353 (1931). See also Heiner v. Colonial Trust Co., 275 U.S. 232, 234-235, 48 S.Ct. 65, 72 L.Ed. 256 (1927)
 
 
 [31]
 We respect the underlying policy of the capital gain exclusion to encourage long-term investment. District of Columbia v. Goldman,supra note 23, 117 U.S.App. D.C. at 221-222, 328 F.2d at 522-523; Garrett v. District of Columbia, 81 U.S. App.D.C. 374, 159 F.2d 457 (1946), cert. denied 330 U.S. 835, 67 S.Ct. 971, 91 L. Ed. 1282 (1947). Congress has not, however, manifested a judgment that its recognition in asset-conversion situations like that here is essential to attainment of its objective.
 
 
 [32]
 Petitioners argue, and Judge Leventhal concludes, that the basis of the Chastleton stock in petitioners' ownership was its market value, with the result that no gain was realized when it was sold. He considers petitioners' receipt of that stock a taxable event imparting its market value basis, and invokes the capital gain exclusion as a bar to income taxation of the stock at the point of petitioner's acquisition
 
 
 [33]
 D.C.Code § 1583c (1967 ed.), provides that "[w]here any property other than money is paid by a corporation as a dividend, the basis to the recipient thereof shall be the market value of such property at the time of its distribution by such corporation." See also, to the same effect, D.C.Code § 47-1551c(m) (1967 ed.), quotedsupra note 10. It is clear from the statutory scheme that Section 1583c makes an exception to the general cost basis specified in Section 47-1583 for determining gain or loss on property dispositions. But, as we have pointed out, see note 14, supra, and accompanying text, an appreciation in the value of corporate assets which is not realized before dissolution does not become a dividend when those assets are distributed on liquidation. And even if the Chastleton stock received by petitioners on Capitol's dissolution were a dividend, its value should have been included as income in their tax returns, which was not done. Thus, had it been given that treatment, their income taxes would have to be readjusted upward.
 
 
 [34]
 See note 29,supra, and accompanying text.
 
 
 [35]
 Together with the other assets, consisting of $80,541.30 in the form of notes receivable and accrued interest. See note 3,supra, and accompanying text.
 
 
 [36]
 Petitioners' three-fifths share of the $20,480 came to $12,288, computed without regard to the $1,200 capital investment included in the book value of the Chastleton stock, which we, like the parties, treat asde minimis.
 
 
 [37]
 CompareOppenheimer II, supra note 9. In that case, corporate assets, the actual value of which reflected unrealized appreciation over their cost to the corporation, were distributed to a stockholder who sought unsuccessfully to sustain a depreciation basis established at fair market value. We affirmed the Tax Court's disallowance of a "stepped-up depreciation base largely comprised of an untaxed, because unrealized, rise in market value" — "a depreciation base," we described, "consisting of a book write-up of a value on which, very properly, no tax need be paid upon its receipt by the stockholder." 124 U.S.App.D.C. at 223, 224, 363 F.2d at 710, 711. Compare Estate of Uline v. District of Columbia, supra note 11, where we concluded that only the cost, and not the fair market value, of stock held in a corporation may be used to reduce the amount taxable as a corporate liquidating dividend.
 
 
 [38]
 Maass v. Higgins, 312 U.S. 443, 449, 61 S.Ct. 631, 85 L.Ed. 940 (1941). See also General Motors Corp. v. District of Columbia, 380 U.S. 553, 559-560, 85 S.Ct. 1156, 14 L.Ed.2d 68 (1965)
 
 
 [39]
 CompareOppenheimer II, supra note 9, 124 U.S.App.D.C. at 224, 363 F.2d at 711.
 
 
 [40]
 Estate of Uline v. District of Columbia,supra note 11.
 
 
 [41]
 SeeOppenheimer II, discussed supra note 37. Our conclusion is in keeping with the principle that "[g]ain is in the end to be completely taxed once, but only once." 3A J. Mertens, Federal Income Taxation § 21.01 (1958).
 
 
 LEVENTHAL, Circuit Judge (dissenting):
 
 33
 We are again confronted with the task of applying the skeletal provisions constituting the District of Columbia income tax law to determine the liability of a shareholder whose close corporation has liquidated and has distributed to its stockholders all of the corporate assets.
 
 
 34
 This problem has been the focus, one way or another, of more cases, decided cases and pending cases, both at the administrative stage and in litigation, than any other issue under the D.C. tax law. The problem is generated by the sketchiness of the D.C. tax provisions, the need for applying them to business transactions which are in large measure responsive to the Federal tax laws, and the difficulty of discerning any meaningful reason for giving the D.C. and Federal laws different consequences.
 
 
 35
 The legal problems have been exacerbated by a lack of consistent analysis by the D.C. assessors; instead they have lurched from one theory to another depending on how they could hope to collect taxes in a case. In turn there have been differences in approach by different panels of this court. I can quite understand why the D.C. Tax Court has stated[1] that it has found our opinions irreconcilable. (It cited Berliner[2] and Snow.[3])
 
 
 36
 I am inclined to agree with the observation of the Oppenheimer II panel that the confusion plaguing taxpayer and collector alike, as well as the courts, is inherent in the anomaly of simultaneous application to the same taxpayer by the same legislature of two different sets of statutory provisions.
 
 
 37
 It is hard to understand why the D.C. tax authorities do not recommend to the Congress a termination of this disparity, especially since we are at a time when states — with the quality of independent sovereignty — are seeking to simplify income tax assessment and collection by incorporating the provisions of the Federal tax laws.
 
 
 38
 But what is the court to do meanwhile? It seemed to me that the court's function is best served by articulating an approach that preserves the differences between the D.C. and Federal tax laws that are ineradicable, in view of their text, but that finds a dominant intention of Congress in the approach of the Federal laws wherever the text of the D.C. law does not interpose an insurmountable barrier. I found no such barrier in this case, and I was able to discern an approach for the D.C. tax laws that harmonizes most, and perhaps all, of the various precedents of this court with each other.
 
 
 39
 I regret that my colleagues declined to join in my approach. It is not compelled by, but it is consistent with that wording of the D.C. laws. My colleagues say otherwise, but I take due and wry note of how they found themselves able to adopt a construction of "cost" in D.C. Code § 47-1583 (1967) that is flatly at odds with its wording because they deemed that construction fully consistent with legislative goals.
 
 
 40
 The difference between us, I think, is that they put a lower value than I on the goal of harmonizing the D.C. and Federal tax approach. For me that goal should be dispositive of Congressional intent, to avoid finding duality of Congressional intent, unless such duality is clear beyond doubt.
 
 
 41
 I. CORPORATE DISTRIBUTION OUT OF EARNED SURPLUS IS EXPRESSLY TAXABLE AS A DIVIDEND.
 
 
 42
 I pass over the facts of the particular case, which are stipulated.[4] The central question is whether and to what extent petitioners were subject to taxation in 1960, when the stock they held since 1948 yielded them a return in the form of property received in liquidation, which three days afterward they sold for $234,000.[5]
 
 
 43
 My approach to the tax consequences flowing from the 1960 distribution by Capitol of its unearned surplus can best be begun by reference to the part of the taxpayer's receipts in 1960 ascribable to Capitol's earned surplus of $99,821.30[6] at the time of the liquidating distribution. The taxing authority determined that petitioners were liable for a tax for "dividends" in the amount of $59,892.78, their 60% of earned surplus.
 
 
 44
 Petitioners did not protest this redetermination, which was clearly required by our 1958 opinion in Berliner v. District of Columbia, 103 U.S.App.D.C. 351, 258 F.2d 651, cert. denied, 357 U.S. 937, 78 S.Ct. 1384, 2 L.Ed.2d 1551 (1958). But it will be helpful to revert to the decision in Berliner to review the setting of the present decision.
 
 
 45
 In Berliner the taxpayer urged that Congress intended corporate liquidations under D.C. tax law to be governed by the same principle as that used in the Federal tax law.
 
 
 46
 The basic approach (with refinements) to complete liquidations under the Federal statute is, and has long been, to treat the transaction as an "exchange" of stock by the shareholder for assets from the corporation.[7] Under this total exchange theory the shareholder receives capital gain or loss depending upon his cost for the stock and the fair market value of the assets distributed, and the holding period, that determines whether he is entitled to the special benefits attaching to long term capital gains, is reckoned by the length of time the shareholder owned the underlying stock.
 
 
 47
 This court ruled in Berliner that the history of the Federal law, and the language of the District law, would not support such a result, despite the logical appeal the pattern possessed. This ruling has been consistently followed.[8] I hasten to interject that this is an instance where the D.C. law is so clear on its face that it simply does not permit supposing that the intent of Congress was the same as that underlying the Federal law.
 
 
 48
 In Berliner the liquidating corporation distributed its accumulated earnings and the taxpayer-distributee argued that what he received was not dividends but gain derived from the exchange of his stock. The court held that the D.C. tax law specifically provides for full taxation of such earnings as a dividend, and failed to contain the express provision whereby the Federal law conferred special capital gains treatment. It was pointed out that the District of Columbia statute expressly provides for taxation of dividends, a term defined as meaning "any distribution made by a corporation * * * to its stockholders * * * out of its earnings, profits, or surplus (other than paid-in surplus), whenever earned by the corporation * * * whether distributed prior to, during, upon, or after liquidation or dissolution of the corporation."[9] The court noted that the more favorable "exchange" treatment for distribution of the earnings was introduced into Federal law by express provision of the 1918 Revenue Act.[10] It was observed that prior to and in the absence of this provision, Federal law had required distribution from corporate earnings to be taxed as "dividends" even for corporate distributions in liquidation.
 
 
 49
 II. CORPORATE DISTRIBUTION OF UNREALIZED APPRECIATION IS NOT TAXABLE AS A DIVIDEND.
 
 
 50
 The question arises as to the tax consequences under the D.C.Code to the recipient of a corporate distribution of a non-inventory asset which has a current value higher than cost to the corporation, reflecting unrealized appreciation.
 
 
 51
 In District of Columbia v. Oppenheimer, 112 U.S.App.D.C. 239, 301 F.2d 563 (1962) — Oppenheimer I — the District attempted to tax as a dividend the full value of property which the corporation distributed in kind to shareholders. There, as here, the distribution consisted of property that had undergone great appreciation in value and there, as here, the corporation had never realized the gain on this increase by selling the property itself. The District argued that the act of distribution resulted in the corporation's "constructively" realizing a gain on the appreciated value of the assets. This court rejected the District's theory stepping up earned surplus.
 
 
 52
 The court held that unrealized appreciation was not "earned" income which is taxable under statutory definition of "dividend." It said: "Since the corporation never realized the appreciation, by sale or otherwise, it was never a part of the corporation's income or earnings."[11] Berliner was distinguished as a case of realized appreciation, where the corporation had sold its assets before making a distribution.
 
 
 53
 Notwithstanding Oppenheimer I, the District sought to defend the tax deficiency asserted against petitioners in the case at bar on the ground that the distribution by Capitol to its stockholders represented a realization of income and hence a dividend to the stockholders to the extent of current market value. The District's contention was that ultimate sale of the Chastleton stock had been engineered by Capitol prior to its dissolution so that it was Capitol and not the stockholders who should be taken as having made the sale. This court rejected that argument as inconsistent with the stipulation which limited earned surplus to the amount of $99,821.30. Verkouteren v. District of Columbia, 120 U.S. App.D.C. 361, 346 F.2d 842 (1965).
 
 
 54
 III. THE CORPORATE DISTRIBUTION OF ASSETS REFLECTING UNEARNED APPRECIATION SHOULD BE HELD TAXABLE AS A RETURN OF CAPITAL — FIRST, REDUCING BASIS OF STOCK; THEN, RESULTING IN TAXABLE GAIN AS TO ANY EXCESS, EXCEPT AS TO STOCK HELD MORE THAN TWO YEARS.
 
 
 55
 On the remand after our 1965 decision, the District Government and the Tax Court assumed that the corporate distribution on January 29, 1960, was devoid of significance under the D.C. tax law insofar as value of assets distributed reflected unrealized appreciation. (A tax deficiency against petitioners was upheld on the ground that a taxable gain occurred later when the stockholders sold the assets.)
 
 A. Applicable Doctrine and Analysis of Basic Tax Concepts
 
 56
 Although the stockholder's receipt of a distribution of corporate assets reflecting unearned appreciation is not taxable as receipt of a dividend, that does not necessarily mean that the stockholder realizes no income, no gain or loss.
 
 
 57
 The correct analysis is aided, I think, by first approaching the situation without the special complications of a corporation in dissolution and a distribution of property in kind.
 
 
 58
 Suppose an on-going corporation makes a cash distribution that is not taxable as a "dividend" — because the corporation has no earnings. This is a commonplace, everyday occurrence in the case of a real estate corporation that has large accruals in depreciation reserves that result in losses in the financial statements, yet has large cash flow that it distributes to the stockholders. Such distributions, sometimes called "non-taxable dividends" in business circles, are not devoid of consequence under the D.C. tax law. Their proper significance is that they are a return of capital, which serves to reduce the basis of the shares held by the stockholder. If these non-taxable dividends reach an amount that exceeds the cost (or other tax basis) of the shareholder's stock, the difference constitutes taxable gross income, under 47 D.C.Code § 1557a[12] (1967), in my opinion, because he got back more than he invested. This income is fully taxed if within two years after a shareholder buys stock he receives distributions (other than taxable "dividends") exceeding the cost of the stock. However, if his stock is a "capital asset" under the D.C.Code because it is not an item of inventory or stock in trade and it has been held by the stockholder for more than two years,[13] the amounts received thereon as return of capital are neither includible in gross income as gains[14] nor deductible from gross income as losses.[15] This is the holding in District of Columbia v. Goldman, 117 U.S.App. D.C. 219, 328 F.2d 520 (1963), a holding to which I would adhere.[16]
 
 
 59
 The same tax consequences flow when the distribution by a corporation without earned surplus is not of cash but of property with a fair market value.
 
 
 60
 The same consequences likewise flow whether the distribution (in cash or property) is by a corporation that is on-going or in liquidation. As Berliner makes clear, the D.C.Code makes no distinction, for purposes of income tax liability of stockholder-distributees, between an ongoing or liquidating corporation.
 
 B. Consideration of Our Precedents
 
 61
 The foregoing analysis of the tax significance of corporate distribution of capital assets, on-going or in liquidation, is not only expressly responsive to doctrine set forth in precedents such as the 1963 Goldman ruling, but also establishes a line of harmony that makes meaningful our entire string of applicable precedents — including 1958 Berliner and its progeny (see supra note 8); the 1962 ruling in Oppenheimer I; and the 1965 ruling in Snow.
 
 
 62
 In Snow the taxpayer purchased all of the stock of a corporation and shortly thereafter liquidated it, receiving all of the assets. The cost of the stock was $1,000,000. The corporation's earned surplus at distribution was $300,000. The value of the assets distributed was $1,000,000. Accordingly, the taxpayer became liable for taxes on a "dividend" of $300,000, but he received non-inventory assets in kind with a fair market value of $1,000,000, leaving $700,000 of distribution unaccounted for. We held that this $700,000 was to be treated as a return on taxpayer's investment, to be treated as gain or loss on the basis of the cost of the stock ($1,000,000). Thus, the taxpayer suffered a loss on his investment which was fully realized at the time of the distribution. This loss — of $300,000 — was fully deductible (although the assets were in kind) since the property out of which the loss grew was held for less than two year by the taxpayer.
 
 
 63
 As the court observed in Snow,
 
 
 64
 If Snow had paid only $500,000 for the stock, surely the District would urge that when he received $700,000 [less than two years later] for that stock he owed a tax on $200,000. Indeed its counsel admitted as much in oral argument. (Emphasis supplied.)
 
 
 65
 124 U.S.App.D.C. at 73, 361 F.2d at 527.
 
 
 66
 My approach would establish a line of consistency with Snow, and also Berliner and Oppenheimer I. The point is, simply, that part of the liquidating distribution is taxable as a "dividend" included in ordinary income (by virtue of the express provision relied on in Berliner) and the rest of the distribution is taxable like any other return of capital.
 
 
 67
 Conversely, the ruling of Oppenheimer I, that distribution of an asset reflecting unrealized appreciation does not permit taxation of that appreciation in value as ordinary income as a dividend,[17] is consistent with recognition that distributions on stock (not held for inventory) are taxable like any other return of capital. Under District of Columbia law return of capital is taxable in full if the stock has been held two years or less, but is exempt, as appears from Goldman, if the stock is long term. In Oppenheimer I, the liquidating distribution came on stock held more than two years. The court properly rejected the inclusion of the value of the distribution in income.
 
 
 68
 For convenience in presentation, our depreciation rulings, notably Oppenheimer II, will be discussed separately below. I interject that I think they are also consistent with my approach.
 
 C. Further Probing of Intent of Congress, as Indicated in Language of D.C.Code and Further Illuminated by Federal Tax Legislation
 
 69
 My analysis is fully supported, I think by a careful probing of the language of the D.C.Code and the policy or intention of Congress as reflected therein and as illuminated by the relevant concepts that have been identified in regard to Federal tax legislation.
 
 
 70
 Perhaps a fair note to strike at this juncture is one of caution against exaggerating the significance of the difference between the provisions of the D.C. and Federal tax laws. Where these differences expressly or by fair implication signal a difference in policy they must be respected, as Berliner makes clear. But where a question of interpretation arises under the D.C. law because it is skeletal or silent, it is not inadmissible to take as an assumption, in the absence of contrary indicia, that filling in the gaps of the D.C. law with a doctrine reflecting working concepts of tax theory and analysis of a kind approved by Congress for Federal tax purposes is not so destructive of legislative policy as to be contrary to sound construction of the D.C. tax provisions.[18]
 
 
 71
 My analysis is supported, however, by more than a general presumption of harmony. It is supported by close examination of what Congress has done in fashioning tax policy and tax wording for the kind of fact situation under consideration.
 
 
 72
 It is first appropriate to recall and emphasize how Congress excluded distributions of assets reflecting unrealized appreciation from the scope of ordinary income. In the original 1913 Federal income tax law the word "dividend" was used broadly enough to include all corporate distributions to shareholders (with exceptions, e. g., distributions from paid-in capital). Use of the term "dividend" without qualification was apparently broad enough to include distributions reflecting the unrealized increment in the value of property owned by the corporation.[19]
 
 
 73
 The 1916 Federal act defined dividends in a more restricted way "to mean any distribution made or ordered to be made by a corporation * * * out of its earnings or profits accrued since * * * [1913] and payable to its shareholders, whether in cash or in stock of the corporation * * * to the amount of its cash value."[20]
 
 
 74
 This provision of the 1916 Federal law is obviously similar to the current D.C. Code definition of dividends. The similarity between the two statutes becomes more complete with the 1921 Federal law. Prior to 1921 the Federal law taxed gains from the sale of capital property in the same way as other income. In 1921 Congress responded to the problem raised concerning those realizations of income that were not fruit from the tree, but really represented conversions of the form and nature of the capital tree, where the gain realized was often a large gain that had accrued over a long period of time, rather than a share of the annual crop of earnings, and the inclusion of the gain resulted in high surtaxes. These considerations led Congress to the familiar Federal capital gain tax provisions, which provided lower rates for gains on capital-type assets held more than two years. Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 77 L.Ed. 199 (1932).
 
 
 75
 The D.C. tax law gives the separation of speculators from investors somewhat different characteristics from those in the Federal law. Under the D.C. law long term gains and losses are excluded from tax entirely and not merely in part. Also Congress has amended the Federal law, but not the D.C. law, to make six months the dividing line rather than two years. These are differences of detail. The broad policy enlivening both D.C. and Federal statutes since 1921 is a deliberate removal of any disincentive or deterrence to conversion of the form of capital wealth that might result from taxing the transaction as a realization of income to be treated in the same way as ordinary income.
 
 
 76
 Section 202 of the 1921 Federal Revenue Act, ch. 136, 42 Stat. 229, defined basis for determining gain or loss on the sale of property. In § 201(c) Congress provided that distributions to stockholders made other than out of earnings or profits "shall be applied against and reduce the basis provided in section 202 for the purpose of ascertaining the gain derived or the loss sustained from the sale or other disposition of the stock or shares by the distributee."[21]
 
 
 77
 This provision applied where "increase in value of property" was a source of distribution to the stockholder. But it did not expressly set forth the rule applicable where the stock was not sold, so that the "basis" provision of section 202 had no applicability. The Senate Committee Report reflected the applicable underlying doctrine of tax law, stating that where such distributions return to the stockholder more than the cost price "he is taxable * * * with respect to the excess in the same manner as though such stock had been sold."[22] (Emphasis supplied.)
 
 
 78
 Let me pause for emphasis and reiterate this point: The tax authorities and Congressional committees all understood, and regarded as fully conforming to underlying legislative intent, a situation whereby — notwithstanding the absence of specific statutory language — a return of capital (on stock) is treated as income realized "as though such stock had been sold." And it is given "favorable" capital gain treatment!
 
 
 79
 In 1924 Congress did add to the Federal tax laws an express paragraph that such returns of capital, to the extent of excess remaining after reducing basis of the stock to zero, "shall be taxable in the same manner as a gain from the sale or exchange of property."[23] This was not put forward as a change. It is explained in Committee Reports as merely a crystallization, in express language, of the Treasury practice under the 1921 act.[24]
 
 
 80
 This historical background reenforces the holding of Goldman that the D.C. law exempts from taxation corporate distributions, other than distributions out of earnings, even though they return to stockholders an amount exceeding the cost of stock, where such receipt comes more than two years after purchase of the stock.
 
 
 81
 The matter is not expressly covered by the D.C.Code in the same way as it has been in the Federal law since 1924. But there is a framework of basic tax concepts relating to capital gain as well as to ordinary income. The materials relating to the state of the Federal tax law under the 1921 act show that these basic concepts provided consensus for the application of favored capital treatment to the case where there are distributions (not out of earnings) reflecting gain on the holding of a stock investment — even in the absence of and prior to the addition of express provision that such distributions are to be taxed "in the same manner as though such stock had been sold."
 
 
 82
 To recapitulate my view, the stockholder who receives for his own dominion and disposition property in which he previously held only a beneficial interest, dependent on the management and disposition decided on by the corporate directors, has a realization on his stock that is included in his gross income, to the extent of fair market value of the property. If his stock holding is "short term" he is fully taxable on any gain — excess over cost of stock — as ordinary income. But if his holding is "long term," the favored tax treatment provided by Congress, different only in details under the D.C. and Federal laws, extends to this kind of change in the form of the capital-type asset (stock plus property instead of mere stock) as constituting a return of capital, treated in the same way as the realization of gain upon a sale of the stock.
 
 D. Consistency with Depreciation Rulings
 
 83
 I now consider, and on reconsideration reject, the possibility of a contention that my approach is subject to challenge on the ground of inconsistency with our depreciation rulings, notably Oppenheimer II.
 
 
 84
 Oppenheimer II establishes that when property with an unrealized increment in value is distributed in liquidation of a close corporation to a stockholder its basis in the hands of the stockholder for purposes of depreciation is no greater than the basis in the hands of the corporation plus allocable earned surplus. That case, as both majority and concurring opinions recognize, turns on the peculiar depreciation provisions of the D.C. law.
 
 
 85
 Since depreciation involves only a deduction reducing tax payable, which essentially is a matter of legislative grace, it is subject to a narrow reading, as requiring an actual "sale" or "exchange" of property in order to increase basis. This deduction stands in contrast to the provisions relating to gain or loss on non-inventory assets, since, as was pointed out in Snow, holding these provisions applicable may result in increase as well as decrease of taxes payable.
 
 
 86
 Oppenheimer II did not disapprove the Tax Court's conclusion that the depreciation deduction provided by Congress permitted a "reasonable" step up to the extent of taxable income realized in distribution. Such reasonable step up would presumably apply not only in the case of taxable income realized by way of dividend, but also taxable income by way of return of capital exceeding the cost of stock held two years or less. Oppenheimer II refused to apply the "reasonable" depreciation provision to step up basis in the case of a close corporation stockholder owning the stock for a long term, and who thus realized no taxable gain. Such a taxpayer was not permitted to avail himself of all the benefits of the depreciation deductions and basis utilized by the corporation, and then claim the benefit of an increase in basis for depreciation even though there had been neither a change in beneficial ownership, nor a taxable gain. To the extent that there was some exposure to taxation (for the liquidating "dividend" paid out of earned surplus) the Tax Court permitted a step up in basis as "reasonable," in a ruling that was neither contested by the District nor criticized in the majority opinion.
 
 
 87
 Snow (supra note 3), thought a different rule was "reasonable" in the case of a newcomer who had to lay out considerable cash in order to acquire the depreciable asset owned by a stranger corporation. There, a change in basis for depreciation was held to accompany a change in beneficial ownership. Whether or not this depreciation ruling of Snow is retained or redefined,[25] it is manifestly consistent with a ruling that the short-term stockholders realize gain if the asset received in liquidation exceeds cost of the stock.
 
 
 88
 IV. TAX SIGNIFICANCE OF SUBSEQUENT SALE OF THE ASSETS RECEIVED IN LIQUIDATING DISTRIBUTION.
 
 
 89
 In my view the liquidating distribution by Capitol to petitioners resulted in (1) a taxable dividend of $59,892.78; (a) a return of capital of $720, the cost (adjusted basis) of the Capitol stock; and (2) an additional return of capital, constituting $221,712.00 on the stock of petitioners which is excluded under the District of Columbia Code since at the time of the distribution to them petitioners had owned the stock for more than two years.
 
 
 90
 I now consider the tax consequences attaching to the subsequent sale by the stockholders of the property received in the corporate distribution.
 
 
 91
 Respondent District contends that taxable gain was realized by petitioners when they sold their property at fair market value three days after distribution. The District would determine the amount of gain by ascribing a basis to the Chastleton stock of $12,288, computed by adding the "dividend" portion of the 1960 distribution of the Chastleton stock, to the cost basis of the Capitol stock in petitioner's hands. The District's brief in support of this calculation adds the qualification that it was made "[w]ithout regard to the de minimis amount of capital investment included in the book value of the [Capitol] stock."[26]
 
 
 92
 If the District really believed in its analysis it would tax the entire proceeds of the sale, to the extent exceeding cost of the Capitol stock, since the statute is explicit that basis equals cost, and provides no justification for increasing basis to the extent of dividends received. This provision does not contain the latitude for "reasonable" adjustments provided in the provision for a depreciation deduction.
 
 
 93
 The District argues that its approach is justified in order that the "gain" to the stockholder be caught and taxed. I have already discussed the means by which such gains are caught at the time of distribution (if realized by a short-term speculator), and if they are not taxed at that time, it is because of countervailing sections of the statute (applicable when the gain is realized by a long term investor).
 
 
 94
 The sound analysis pertaining to property distributed by a corporation to its stockholders is that it has a basis in the hands of a stockholder equal to the fair market value at the time of distribution. The Code is explicit as to property constituting a "dividend." As to property constituting a return of capital, we are remitted to the general doctrine that the fundamental basis of property is "cost." Basic tax law concepts, expressly confirmed by both D.C. and Federal statutes, makes it clear that the cost concept translates in the case of property acquired on exchange to the fair market value of the property received at the time of receipt. The same rule applies when a distribution of property is not an exchange but a return of capital, constituting "gross income," whether by an on-going corporation (like the distribution considered in Goldman) or by a corporation in dissolution (cf. Berliner v. District of Columbia, supra note 2).
 
 
 95
 In terms of tax concepts the property received has a "cost" equal to its fair market value because that amount is forthwith and instantaneously applied in reduction of the cost basis of the stock. That reduction of cost basis exposes a shareholder to increase in present or future tax liability.[27]
 
 
 96
 This analysis is in accordance with the history of the construction of the Federal statute. At the present time, pursuant to a 1954 amendment, the Federal Internal Revenue Code expressly provides that fair market value is "the basis of property received in a distribution" without differentiation between distributions to shareholders constituting dividends or return of capital.[28] But the same result was reached even in the absence of express language, as a corollary of the core "cost" concept of basis.[29]
 
 
 97
 Accordingly, the property distributed to Capitol's stockholders had a basis in their hands of fair market value at time of distribution. Since petitioners sold that property within two years after receipt, gain or loss would have been recognized in full if the property had increased or decreased in value between the date of receipt as a corporate distribution and the date of subsequent disposition. Here, of course, there was no change in value in that three-day period, and accordingly, in my view, no gain or loss was realized at the time of disposition.
 
 
 98
 For the foregoing reasons I would have granted the petition for review, and reversed the determination of the Tax Court.
 
 
 
 Notes:
 
 
 [1]
 See Lenkin v. District of Columbia, CCH D.C.TAX REP. ¶ 200-113, at 10378 (D.C. Tax Ct. October 11, 1967).
 
 
 [2]
 Berliner v. District of Columbia, 103 U.S. App.D.C. 351, 258 F.2d 651, cert. denied, 357 U.S. 937, 78 S.Ct. 1384, 2 L.Ed.2d 1551 (1958)
 
 
 [3]
 Snow v. District of Columbia, 124 U.S. App.D.C. 69, 361 F.2d 523 (November 22, 1965), rehearingen banc denied (February 1, 1966). Oppenheimer v. District of Columbia, 124 U.S.App.D.C. 221, 363 F.2d 708 (June 17, 1966), rehearing en banc denied (August 17, 1966) (so-called Oppenheimer II or Second Oppenheimer), decided after Snow, does not mention Snow, but cites Berliner with approval.
 
 
 [4]
 See Verkouteren v. District of Columbia, 120 U.S.App.D.C. 361, 346 F.2d 842 (1965).
 
 
 [5]
 The record does not indicate who negotiated the sale, Capitol or petitionersSee Verkouteren v. District of Columbia, supra note 4.
 
 
 [6]
 This figure is stipulated to be correctSee Verkouteren v. District of Columbia, supra note 4, where respondent unsuccessfully attempted to enlarge this amount in the teeth of a stipulation.
 
 
 [7]
 INT.REV.CODE of 1954, § 331
 
 
 [8]
 See Doyle v. District of Columbia, 124 U.S.App.D.C. 207, 363 F.2d 694 (1966); Estate of Uline v. District of Columbia, 124 U.S.App.D.C. 5, 360 F.2d 820 (1966); Snow v. District of Columbia, 124 U.S. App.D.C. 69, 361 F.2d 523 (1965); District of Columbia v. Oppenheimer, 112 U.S.App.D.C. 239, 301 F.2d 563 (1962)
 
 
 [9]
 47 D.C.Code § 1551c(m) (1967)
 
 
 [10]
 That law provided: "Amounts distributed in the liquidation of a corporation shall be treated as payments in exchange for stock or shares, and any gain or profit realized thereby shall be taxed to the distributee as other gains or profits." Rev.Act of 1918, ch. 18, § 201(c), 40 Stat. 1059 (now INT.REV.CODE of 1954, § 331)
 
 
 [11]
 See 112 U.S.App.D.C. at 240, 301 F.2d at 564.
 
 
 [12]
 This section taxes:
 "gains, profits, and income derived from salaries, wages, or compensation for personal services of whatever kind and in whatever form paid * * * or income derived from any trade or business or sales or dealings in property, whether real or personal * * * also from rent, royalties, interest, dividends, securities or transactions of any trade or business carried on for gain or profit, * * * and income derived from any source whatever."
 
 
 [13]
 D.C.Code § 1551c(l):
 "The words `capital assets' mean any property, whether real or personal, tangible or intangible, held by the taxpayer for more than two years (whether or not connected with his trade or business), but do not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the end of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."
 
 
 [14]
 See 47 D.C.Code § 1557a (1967): "(b) The words `gross income' shall not include the following: * * * (11) Capital Gains. — Gains from the sale or exchange of any capital assets as defined in this subchapter."
 
 
 [15]
 See 47-1557b (1967): "(b) Deductions not allowed — In computing net income, no deductions shall be allowed in any case for — * * *
 (6) Capital losses. — Losses from the sale or exchange of any capital asset as defined in this subchapter."
 
 
 [16]
 The ruling inGoldman is that distributions out of capital (depreciation reserves) are not taxable when received by stockholders who have held their stock for more than two years. The court relied on the provisions of Sections 1557a, 1557a(b) (11), 1551c(l), defining gross income as including income from sales or dealings in property other than capital assets (property, other than inventory, held for more than two years), and pointed out that the exemption of capital income held by investors, rather than short term speculators, afforded "encouragement of an investor in the economic life of the District."
 The court did not expressly focus on the taxability of distributions out of capital within two years or less. Nor did it advert to the tax significance of such distributions as first reducing basis and then constituting income (taxable if short term). However this analysis was set forth in precedents quoted by the D.C. Tax Court and the treatment and opinion of that court, as well as the result, were expressly approved by this court (see 117 U.S.App.D.C. at 220, 328 F.2d at 521).
 
 
 [17]
 Distribution to stockholders does not of itself effect realization of income to the corporation, and hence is not taxable as a dividendSee also General Util. & Operating Co. v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154 (1935); cf. S. REP. No. 2114, 76th Cong., 3d Sess. 25 (1940): "Of course, mere increase or decrease in value (after February 28, 1913) of property owned by a corporation does not increase its earnings profits."
 
 
 [18]
 Broadcasting Publications, Inc. v. District of Columbia, 114 U.S.App.D.C. 163, 166, 313 F.2d 554, 557 (1962)
 
 
 [19]
 See Lynch v. Hornby, 247 U.S. 339, 344, 38 S.Ct. 543, 545, 62 L.Ed. 1149 (1918): "Dividends are the appropriate fruit of stock ownership, are commonly reckoned as income, and are expended as such by the stockholder without regard to whether they are declared from the most recent earnings, or from a surplus accumulated from the earnings of the past,or are based upon the increased value of the property of the corporation." (Emphasis added.)
 
 
 [20]
 See Rev.Act of 1916, ch. 463, § 2(a), 39 Stat. 757.
 
 
 [21]
 Rev.Act of 1921, ch. 136, § 201(c), 42 Stat. 228
 Any distribution (whether in cash or other property) made by a corporation to its shareholders or members otherwise than out of (1) earnings or profits accumulated since February 28, 1913, or (2) earnings or profits accumulated or increase in value of property accrued prior to March 1, 1913, shall be applied against and reduce the basis provided in section 202 for the purpose of ascertaining the gain derived or the loss sustained from the sale or other disposition of the stock or shares by the distributee.
 
 
 [22]
 S.REP. No. 275, 67th Cong., 1st Sess. 9-10 (1921)
 
 
 [23]
 Rev.Act of 1924, ch. 234, § 201(d), 43 Stat. 255
 
 
 [24]
 S.REP. No. 398, 68th Cong., 1st Sess. 12 (1924); H.R.REP. No. 179, 68th Cong., 1st Sess. 12 (1924)
 
 
 [25]
 I am not called upon to reconsiderSnow or indicate its limitations. It suffices here to say that the depreciation ruling in Snow is not inconsistent on its facts with the depreciation ruling in Oppenheimer II.
 
 
 [26]
 Brief for Respondent p. 3, n. 2
 
 
 [27]
 A short-term holder has this exposure under present provisions of D.C. law — either at time of distribution, if the return of capital exceeds the cost of the stock, or at the time the stock is sold. A long-term holder currently has the benefit of an exemption under D.C. law, unless before the stock is sold legislation causes this exemption to be modified, say to provide only the partial benefit of lower rates of taxation for long-term capital gains, or even removed
 
 
 [28]
 INT.REV.CODE of 1954, § 301(d) (1). A special provision is inserted where the shareholder is a corporation
 
 
 [29]
 See MERTEN, LAW OF FEDERAL INCOME TAXATION, Commentary § 301(d) (1968), citing Estate of Isadore L. Myers, I.T.C. 100 (1942). There was no express provision prior to 1954 in the case, e. g., of a distribution of property that operated in the stockholder's hands as a partial reduction in the cost basis of his stock.